**LAFAYETTE BEVERAGE DISTRIBUTORS, INC., Plaintiff,**

v.

**ANHEUSER–BUSCH, INC., Defendant.**

No. L 82–52.

United States District Court,
N. D. Indiana,
Hammond Division at Lafayette.

Aug. 25, 1982.

Daniel P. Byron, Phillip A. Terry, Indianapolis, Ind., Carl J. Sandy, Lafayette, Ind., for plaintiff.

Paul J. DeVault, Malcolm C. Mallette, Indianapolis, Ind., Paul D. Ewan, Lafayette, Ind., Terrence C. Sheehy, Peter E. Moll, Washington, D. C., Thomas H. Singer, South Bend, Ind., for defendant.

SHARP, Chief Judge.

This is a civil action seeking damages and injunctive relief for alleged violations of the Sherman Anti-Trust Act, 15 U.S.C. § 1, Indiana franchise statutes, Indiana alcoholic beverage statutes and for breach of contract. This case is presently before the Court on plaintiff's, Lafayette Beverage Distributors, Inc., Motion for Preliminary Injunction. The parties presented testimony and oral argument before this Court on July 6, 1982 and have submitted briefs on the motion. The Court now finds the facts and states its conclusions of law thereon in accordance with Rules 52 and 65 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff, Lafayette Beverage Distributors, Inc. ("Lafayette Beverage"), is an Indiana corporation with its principal place of business in Lafayette, Indiana. Lafayette Beverage is a large, diversified wholesale of alcoholic beverages, licensed by the Indiana Alcoholic Beverage Commission and the Bureau of Alcohol, Tobacco and Firearms. In 1981, Lafayette Beverage had net sales of $8,088,249 and assets of $1,373,277. Lafayette Beverage distributes the products of Anheuser-Busch, Inc., Miller Brewing Co., Schlitz Brewing Co., Stroh Brewing Co., Heileman, Falstaff Brewing Co., Heineken, St. Pauli Girl and Grolsch. Lafayette Beverage also distributes wines such as Almaden, Gallo, Taylor's, Manischewitz, Blue Nun, Riunite and various imports from France and Italy.

2. Defendant, Anheuser-Busch, Inc. ("Anheuser Busch"), is a Missouri corporation with its principal place of business in St. Louis, Missouri. Anheuser-Busch is a brewer of various brands of Malt beverages, including Budweiser, Budweiser Light, Michelob, Michelob Light, Natural Light and Busch.

3. The matters in controversy in this cause of action exceed, exclusive of interests and costs, the sum of $10,000. Anheuser-Busch and Lafayette Beverage are found and transact business within this district.

4. Lafayette Beverage is a company which merged with another Lafayette beer wholesaler, Quality Beer, Inc., in late 1980. Prior to the time of this merger, and since approximately 1965, Quality Beers had been a wholesale distributor of products manufactured by Anheuser-Busch. Following the merger, in January 1981, Lafayette Beverage assumed the distribution of these products manufactured by Anheuser-Busch. At the time Anheuser-Busch approved the merger with Quality Beers, Lafayette Beverage was distributing products of the Miller Brewing Co. and other competitors of Anheuser-Busch, such as Schlitz and Stroh's.

5. On January 15, 1981, Lafayette Beverage and Anheuser-Busch entered into a Wholesaler Equity Agreement ("Equity Agreement") governing all relations and dealings between the parties and setting forth their respective rights and obligations. The Equity Agreement entered into by Lafayette Beverage is identical to the agree-

ment which Anheuser-Busch has offered to each of its other wholesalers.

6. The Equity Agreement designates Lafayette Beverage as a wholesale distributor of the products manufactured by Anheuser-Busch within Lafayette Beverage's primary area of responsibility, which area encompasses the Indiana counties of Tippecanoe and Clinton. By its terms, the Equity Agreement does not restrict the areas within which Lafayette Beverage may sell its products, nor does it restrict Lafayette Beverage's right to distribute products manufactured by other brewers.

7. Anheuser-Busch has no policy of restricting the sales of its wholesalers to their respective areas of primary responsibility. All Anheuser-Busch wholesalers, including Lafayette Beverage, are independent businessmen and are free to sell Anheuser-Busch products wherever they choose. Anheuser-Busch has never told Lafayette Beverage that it could not sell outside its area of primary responsibility.

8. A "transshipper" is a wholesale distributor who sells beer in Indiana counties other than its county or counties of primary responsibility.

9. Indiana ABC Rule 28 permits wholesalers to sell anywhere in the state and transshipping is prevalent throughout the state. Many Anheuser-Busch Indiana wholesalers sell outside their areas of primary responsibility. Approximately 25% of Anheuser-Busch products distributed in Indiana are sold by wholesalers outside of their respective areas of primary responsibility.

10. Three or four Anheuser-Busch wholesalers, other than Lafayette Beverage, sell in Lafayette Beverage's area of primary responsibility. Lafayette Beverage has frequently complained about sales by these other wholesalers. Anheuser-Busch has taken no action in response to complaints about transshipping from Lafayette Beverage or any other Indiana wholesaler, beyond informing the complaining wholesaler that there is nothing Anheuser-Busch can do about transshipping.

11. Lafayette Beverage has been selling Anheuser-Busch products outside of its area of primary responsibility since September 1981.

12. Anheuser-Busch has not terminated or threatened to terminate any Indiana wholesaler as a consequence of sales outside of that wholesaler's area of primary responsibility. Lafayette Beverage was not terminated for selling outside its area of primary responsibility.

13. It is the policy of Anheuser-Busch that all Anheuser-Busch wholesalers, as independent businessmen, determine their own resale prices and are free to sell Anheuser-Busch products at any price they choose.

14. Anheuser-Busch has at times suggested resale prices to Lafayette Beverage and other wholesalers. Anheuser-Busch advised the wholesalers that all decisions on resale prices were theirs alone to make.

15. Mr. Rogers executes and submits Form B-19 to the division office as required by Anheuser-Busch company policy whenever he presents a price promotion to Lafayette Beverage or any other wholesaler. Form B-19 reads in part:

I advised the above-named wholesaler that he will receive this promotional allowance whether or not he elects to pass all or any part of the allowance on to retailers and regardless of whether or the extent to which he may elect to participate on his own. I further advised the wholesaler that whatever action he may take is his own decision.

16. Mr. Rogers never made Anheuser-Busch promotional allowances to Lafayette Beverage conditional on Lafayette Beverage's pricing. Lafayette Beverage frequently participated in Anheuser-Busch price promotions because it was a good way to move more merchandise and increase sales.

17. The sale of Budweiser Light to Lafayette Beverage was not conditioned by Anheuser-Busch on Lafayette Beverage's agreement to sell Budweiser Light at, below or above any price.

18. Lafayette Beverage did not always follow the prices suggested by Mr. Rogers and other Anheuser-Busch representatives. Lafayette Beverage set its own prices at levels necessary to be competitive with other wholesaler's prices.

19. Wholesaler prices on Anheuser-Busch products in Indiana vary to a large degree, despite Anheuser-Busch's uniform F.O.B. price to all of its Indiana wholesalers.

20. Anheuser-Busch did not take any action to discipline Lafayette Beverage for any variance from Anheuser-Busch's suggested resale price.

21. Anheuser-Busch's decision to terminate Lafayette Beverage was a unilateral one, made solely by Anheuser-Busch without consultation or collusion with any other party.

22. Paragraph 6 of the Equity Agreement provides that Anheuser-Busch has the right to immediately terminate the brewer-wholesaler relationship if certain enumerated events occur. One of those events is: "Fraudulent conduct of wholesaler in any of its dealings with Anheuser Busch or its Products."

23. Lafayette Beverage was sent a notice of termination by certified mail, return receipt requested, on May 20, 1982. The termination notice stated that the ground for termination was that Lafayette Beverage engaged in fraudulent conduct in their dealings with Anheuser-Busch or its product. The termination notice further provided that Lafayette Beverage would have 30 days to windup its business with regard to Anheuser-Busch products.

24. On December 9, 1981, Randolph Rogers, Anheuser-Busch's District Manager, received a report from the Anheuser-Busch Division Office in South Bend, Indiana, that Lafayette Beverage had picked up some overage draught beer from retail accounts and was offering it for sale.

25. On December 10, 1981, Randolph Rogers drove to Lafayette Beverage to ascertain whether the report was true. At Lafayette Beverage, Rogers inspected Lafayette Beverage's inventory and discovered 82 half-barrels of overage Busch draught beer, and 12 quarter-barrels of overage Michelob Light draught beer. The overage half-barrels of Busch draft beer were code dated 286, which indicates that the beer was brewed on October 13, 1981 and was therefore 58 days old.

26. Beer is perishable and draught beer which is not pasteurized deteriorates quickly. Anheuser-Busch's overage beer policy is that draught beer is not to be sold by a wholesaler to a retailer after 35 days and in no event can draught beer be sold to a consumer after 45 days.

27. It is vital to Anheuser-Busch to maintain the quality and integrity of its products and it is imperative that overage product not reach retailers or consumers. The sale of overage product injures the reputation and good will of Anheuser-Busch, its wholesalers and its products.

28. It is a generally recognized industry standard at the brewer, wholesaler and retailer levels that overage product should not be sold, and all brewers have such a policy prohibiting the sale of overage product.

29. Before approving the merger with Quality Beers, Anheuser-Busch requested a market plan from Lafayette Beverage which James Lamb submitted on August 21, 1980. In Lafayette Beverage's market plan, Mr. Lamb stated that he would attempt to give a most honest and clear picture of the new wholesale operation. On overage beer policy, Mr. Lamb stated that Lafayette Beverage would immediately remove from the account and destroy any Anheuser-Busch draft beer that exceeded 45 days after code date.

30. Paragraph 8 of the Equity Agreement specifically deals with overage product and provides that in no event

shall over-age Product (according to age standards published from time to time by Anheuser-Busch) reach the consuming public. If any over-age Product is found in the possession of wholesaler or in the possession of a retailer to whom wholesaler sold such Product, wholesaler agrees,

unless prohibited by law, to destroy such over-age Product in accordance with all applicable laws and regulations, and to replace any such Product which had been in the possession of a retailer with fresh Product at no cost to the retailer. Wholesaler's cost of destroying and replacing over-age Product shall be borne by wholesaler or by Anheuser-Busch, depending upon which party was responsible for the over-age condition.

31. Randolph Rogers pointed out the 82 half-barrels of over-age Busch draft beer to Lonnie Dutton, Lafayette Beverage's Warehouse Manager, and telephoned the Anheuser-Busch Division Office to report the overage beer. When Rogers returned from making the phone call, he discovered that the drivers were loading the overage beer onto trucks for delivery to retail customers. Rogers told Dutton that the beer would have to be taken off the trucks, which it was.

32. That same afternoon, Mr. Rogers discussed the overage draught beer with James Lamb, President and General Manager of Lafayette Beverage, and John O'Toole, an independent salesman for Lafayette Beverage. Mr. Rogers told Mr. Lamb that the beer had to be dumped because it was overage. Mr. Lamb and Mr. O'Toole suggested several alternative other than destruction of the beer. Mr. Rogers insisted, however, that the beer had to be destroyed, and told Mr. Lamb that either the beer could be dumped immediately or Mr. Lamb could wait until the proper forms had been filled out and submitted to the Federal Bureau of Alcohol, Tobacco and Firearms so that Lafayette Beverage could obtain a refund of federal excise taxes which had been paid on the beer. Mr. Lamb agreed to destroy the beer but decided to wait to obtain the tax refund.

33. Mr. Rogers requested David McDonald in the Revenue Department at Anheuser-Busch's Columbus brewery to send the appropriate refund application to the Bureau of Alcohol, Tobacco and Firearms and on December 14, 1981, Mr. McDonald notified the Bureau that the 82 half-barrels of overage Busch draught beer found at Lafayette Beverage were to be destroyed.

34. On January 4, 1982, Lafayette Beverage received a letter notifying it that the Bureau of Alcohol, Tobacco and Firearms had granted permission to destroy the 82 half-barrels of overage Busch draught beer, without a witness from the Bureau present. Attached to the letter were the appropriate Bureau papers including several blank affidavits to be filled out by Lafayette Beverage and returned to the Bureau when the beer was destroyed. The beer could have been dumped at any time thereafter.

35. On January 13, 1982, Mr. Rogers returned to Lafayette Beverage and the 82 half-barrels of overage Busch draught beer were still there. Mr. Rogers and Mr. Lamb mutually decided that the overage beer would not be dumped that day because of the extremely low temperature and the possibility of the beer freezing.

36. When Mr. Rogers was at Lafayette Beverage on January 13, 1982, no other alternative to dumping the overage beer was discussed. Mr. Lamb never brought up the subject of selling the beer or tasting the beer to determine its quality. The same afternoon, Mr. Lamb, Mr. O'Toole and Mr. Dutton tested two or three of the 82 half-barrels of the overage Busch draught beer and agreed that it looked, tasted and smelled good. Mr. O'Toole then phoned Picadilly's and sold the beer.

37. Lafayette Beverage never checked to see how old the beer was when it was sold to Picadilly. At that time, the beer was 90 days old. Lafayette Beverage had knowledge on the day of the sale and delivery of the 82 half-barrels of Busch draught beer to Picadilly that the beer was out-of-date for a period longer than 45 days.

38. When Mr. O'Toole sold the beer to Picadilly, he did not tell Mr. Finley that the beer was out-of-code date or overage. Mr. O'Toole told Mr. Finley that the beer still had three or four days to go until it was out-of-date. Mr. O'Toole also told Mr. Finley to "pull" the beer if there were any complaints and Lafayette Beverage would replace it.

39. On the evening of January 13, 1982, after the Lafayette Beverage offices were closed and the employees at Lafayette Beverage had gone home, the 82 half-barrels of overage Busch beer were loaded on a truck. Mr. Lamb himself helped load the truck. The truck was not a Lafayette Beverage truck or even a beer delivery truck but rather an old farm truck.

40. The next morning, the beer was delivered to Picadilly without a computerized invoice. The driver of the delivery truck, Mr. Fry, left a handwritten receipt with Picadilly. The receipt did not indicate who sold the beer to Picadilly, what brand of beer was sold, the account number or the licensed number. All of this was contrary to the normal procedure at Lafayette Beverage.

41. Alex Finley, the owner and operator of Picadilly, was told to make out the check for the 82 half-barrels of overage Busch draught beer to "J & J Brokerage", despite the fact that the normal procedure would be to have the purchaser make out the check to "Lafayette Beverage". Lafayette Beverage never had any other checks to pay for beer sold by Lafayette Beverage made out to "J & J Brokerage."

42. On January 18, 1982, Mr. O'Toole was advised by Mr. Finley that there were complaints about the taste of the beer and Mr. O'Toole advised Mr. Finley to remove the beer and requested that Picadilly dump the Busch product as soon as its work schedule permitted and promised that Lafayette Beverage would replace the Busch beer with half-barrels of Miller.

43. The replacement Miller beer was loaded and shipped to Picadilly on Wednesday, January 20, 1982. The truck broke down in transit and when Mr. O'Toole called Picadilly to inform them of the breakdown, he was advised the overage product had been replaced by Busch draft beer by Anheuser-Busch's Marion County distributor, B–F Beverages.

44. On January 20, 1982, Mr. Rogers received information that Lafayette Beverage had sold the 82 half-barrels of overage Busch draught beer to Picadilly. Rogers

telephoned Mr. Lamb and inquired about the 82 half-barrels of overage beer. Mr. Lamb told Mr. Rogers that he had found a fast way to dump the beer and that it was going so fast that he had already dumped three or four half-barrels. Mr. Lamb then told Mr. Rogers that he would return the empty half-barrels by the end of the week, Friday, January 22, 1982. Mr. Lamb did not tell Mr. Rogers that the beer had been sold to Picadilly. Mr. Rogers reminded Mr. Lamb that he must have someone witness the destruction of the beer and that the appropriate forms had to be filled out in order to receive a refund for the taxes paid on the beer. Mr. Lamb told Mr. Rogers that he realized this, that it would be no problem and that it would be done.

45. Mr. Rogers then drove to Picadilly where he discovered the 82 half-barrels of overage Busch draught beer. At approximately 4:00 P.M. that day, Mr. Rogers called Mr. Lamb and told him that he was at Picadilly and had found the 82 half-barrels of overage Busch draught beer. Mr. Lamb responded that he did not know what Mr. Rogers was talking about and that he would have to get back to Mr. Rogers later, which he never did.

46. Mr. Rogers then called Mr. Charles Romer, Anheuser-Busch's Manager of Division 340 which encompasses the State of Indiana to report the sale of the overage beer by Lafayette Beverage to Picadilly. Mr. Romer instructed Mr. Rogers to make a detailed inquiry, take pictures and obtain copies of any invoices.

47. After his telephone conversation with Mr. Rogers, Mr. Romer called William Bogan, the Sales Manager of Lafayette Beverage, and told him to hold all of the empty half-barrels from the overage Busch draught beer. Mr. Bogan told Mr. Romer that this would be done and conveyed that message to Mr. Lamb.

48. At approximately 5:00 P.M. on January 20, 1982, Alex Finley arrived at Picadilly. Mr. Finley told Mr. Rogers that Picadilly had purchased the overage beer from Lafayette Beverage but that he had not

been told at the time of purchase that the beer was out-of-code date. Mr. Finley also stated that Mr. Lamb had told him that he would send Mr. Finley a new computerized invoice indicating that the 82 half-barrels of Busch beer were Miller beer in an attempt to cover up the incident.

49. Mr. Finley gave Mr. Rogers the computerized sales ticket purporting to show that Lafayette Beverage had sold Picadilly 82 half-barrels of Miller on January 14, 1982 and the actual receipt left at Picadilly on January 14, 1982 by Lafayette Beverage. The computerized sales ticket given to Mr. Rogers by Mr. Finley is invoice number 11350 and is dated January 14, 1982. The date on the invoice is supposed to show the date the beer is delivered. When a different brand of beer is delivered to replace beer which has been the subject of complaint, the normal procedure at Lafayette Beverage would be to have the invoice date to be the date the beer was being replaced. Invoice No. 11350 was generated on or about January 20, 1982 and was backdated to show that the Miller beer was delivered on January 14, 1982, the day the overage Busch beer was sold to Picadilly by Lafayette Beverage. Invoice No. 11350 does not indicate that the Miller beer was a replacement for the Busch beer sold on January 14, 1982 to Picadilly.

50. Before leaving Picadilly on January 20, 1982, Mr. Rogers made arrangements to have the overage Busch draught beer picked up and replaced. On January 21, 1982 Mr. Rogers visited the Lafayette Beverage warehouse. Mr. Rogers asked Mr. Lamb where the overage beer was and Mr. Lamb responded that the empty half-barrels of overage beer had been sent back to the brewery on January 14, 1982.

51. Lafayette Beverage has sold overage Anheuser-Busch products previously and has also sold overage products of other brewers on a number of occasions. In June 1981, Mr. Rogers permitted Lafayette Beverage to sell draught beer that was over 35 days old to a retail outlet. The beer was not past the 45 day limit for sale to consumers. Mr. Rogers did so at the request of Mr. Lamb and after tasting the beer to determine its quality and being given Mr. Lamb's express assurance that the beer would be sold immediately to a retail outlet which could resell the beer before the 45 day limit had expired. Mr. Rogers personally checked the retail account to determine that the beer had been sold within the 45 day period.

52. Mr. Rogers and Mr. Romer recommended to Mr. Sobbe, Anheuser-Busch's Region III Manager, that Lafayette Beverage be immediately terminated as an Anheuser-Busch wholesaler on the basis of the Picadilly incident. The sole basis for the recommendations of Mr. Rogers and Mr. Romer was Lafayette Beverage's conduct in connection with the sale of the 82 half-barrels of overage Busch draught beer to Picadilly.

53. Mr. Sobbe recommended immediate termination of Lafayette Beverage as an Anheuser-Busch wholesaler to the Anheuser-Busch Marketing Department in St. Louis, Missouri after a careful review of the facts and circumstances surrounding the Picadilly incident.

54. In April 1982, Michael J. Roarty, Vice-President of Marketing for Anheuser-Busch, called Bernard Crimmons at Lafayette Beverage to inquire into the facts surrounding the sale of the overage beer to Picadilly. Soon thereafter, James Lamb, William Lamb, and Bernard Crimmons had a telephone conversation with Mr. Roarty in which James Lamb explained the entire Picadilly incident. Mr. Roarty told Mr. Lamb that August Busch III, Chairman of the Board and Chief Executive Officer of Anheuser-Busch, felt very strongly about product quality and that Mr. Busch would probably recommend termination because of the sale of overage beer.

55. On April 29, 1982, Mr. Romer met with William Lamb, Bernard Crimmons and James Lamb of Lafayette Beverage and Anheuser-Busch District Manager Ed Newton in Lafayette, Indiana. The purpose of the meeting was to determine if Lafayette Beverage would restructure its beer wholesale operations so that James Lamb would no longer be involved in the distribution of Anheuser-Busch products.

56. Anheuser-Busch's top management subsequently decided to terminate Lafayette Beverage as an Anheuser-Busch wholesaler pursuant to paragraph 6 of the Equity Agreement on the basis of the conduct of Lafayette Beverage regarding the sale of the overage draught beer to Picadilly.

57. Budweiser Light was introduced into the Indiana market in March 1982. Budweiser Light was offered and supplied to all of Anheuser-Busch's Indiana wholesalers. Anheuser-Busch's Indiana wholesalers, who also handled Miller Lite were supplied Budweiser Light on a temporary basis and whether the wholesaler would retain Budweiser Light would be made on the basis of their performance with the brand and their efforts to market the product during 1982.

58. Anheuser-Busch did not condition the supply of Budweiser Light to Lafayette Beverage upon an expenditure of $4000 or any other amount to local advertising and promotional efforts by Lafayette Beverage. Anheuser-Busch did not condition the sale of Budweiser Light to any other Indiana wholesaler on any agreement on the part of the wholesaler to commit funds for advertising and promotional activities.

59. Anheuser-Busch has no policy or plan to reduce the number of Anheuser-Busch wholesalers in Indiana for reasons of convenience to Anheuser-Busch or for any other reason. Anheuser-Busch has no policy or plan to terminate Anheuser-Busch wholesalers in Indiana who distribute products manufactured by Miller Brewing Company. Lafayette Beverage was a wholesaler of Miller products at the time Anheuser-Busch approved the merger between Lafayette Beverage and Quality Beers, an Anheuser-Busch wholesaler.

60. All Anheuser-Busch wholesalers are free to carry the brands of competing brewers. Neither Anheuser-Busch nor any of its representatives has told Lafayette Beverage that it could not handle Miller products or the products of competing brewers. Lafayette Beverage was not terminated for distributing the products of Miller Brewing Company or any other brewer.

61. Mr. Romer stated at a meeting held at Lafayette Beverage on April 29, 1982 attended by James Lamb, William Lamb and Bernard Crimmons of Lafayette Beverage that Anheuser-Busch could not do business with Lafayette Beverage as it was currently constructed and that Anheuser-Busch would require the establishment of a new company under a new name. Mr. Romer further stated that Mr. Bernard Crimmons must be active in the new company or someone highly qualified who Anheuser-Busch would approve.

62. Anheuser-Busch has the policy of treating all of its wholesalers, including Lafayette Beverage, as independent businessmen. The provisions and terms of the Equity Agreement entered into between Anheuser-Busch and Lafayette Beverage governs all relations and dealings between Anheuser-Busch and Lafayette Beverage. The evidence submitted reveals no instances of Anheuser-Busch controlling or attempting to control the internal affairs of Lafayette Beverage or any other Indiana wholesaler.

63. Lafayette Beverage did not enter into a contract with Anheuser-Busch for the sale of Budweiser Light nor did Lafayette Beverage pay a franchise fee in order to sell Budweiser Light.

64. Prior to the merger with Quality Beers in January 1981, in which Lafayette Beverage obtained the right to distribute Anheuser-Busch products, Lafayette Beverage was a good business, healthy company which was making money and in a good financial position. Lafayette Beverage is currently losing money on the distribution of Anheuser-Busch products.

65. Anheuser-Busch products account for 28.8% of Lafayette Beverage's beer business. Lafayette Beverage currently distributes the following brands of beer, in addition to Anheuser-Busch: Stroh, Stroh Light, Stroh Dark, Miller, Miller Lite, Lowenbrau Light, Lowenbrau Dark, Schlitz, Schlitz Light, Schlitz Malt Liquor, Old Milwaukee, Falstaff, Wiedeman, Sterling, Drewry's, Turborg Good, Beck's, Grolsch, and Altemeister.

66. The dollar figure on any damage to Lafayette Beverage's reputation or good will and the economic harm suffered by Lafayette Beverage if it loses the Anheuser-Busch brands can be computed.

67. Lafayette Beverage has no long term commitments to supply its customers with Anheuser-Busch or any other products. Lafayette Beverage normally handles customer orders on a 24 hour basis. John O'Toole of Lafayette Beverage meets with certain customers, such as Osco's, 21st Amendment and United Beverage every four or five weeks to set up the promotional efforts and commitments for the next four or five weeks. Any commitments made with customers of Lafayette Beverage for the month of August 1982 were made after Lafayette Beverage received its notice of termination from Anheuser-Busch.

68. Lafayette Beverage cannot identify which of its customers will cease to do business with Lafayette Beverage if it loses distribution of Anheuser-Busch products. Lafayette Beverage has not discussed with its customers whether they will cease doing business with Lafayette Beverage if Lafayette Beverage loses the Anheuser-Busch brands.

69. There are approximately 60 wholesalers of Anheuser-Busch products in Indiana. Current customers can purchase Anheuser-Busch products from any one of the wholesalers.

70. The sale of overage beer injures the good will and reputation of Anheuser-Busch. Any harm caused by the sale of the overage beer to Picadilly has already been suffered by Anheuser-Busch. Lafayette Beverage will suffer substantial economic harm if a preliminary injunction is not granted.

71. The public interest will not be served by the entry of a preliminary injunction. The public is deceived when one person sells an inferior product as the superior product.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action under Sections 1331, 1332 and 1337 of Title 28 of the United States Code and venue is proper under 18 U.S.C. § 1391.

■ 2. The issuance of a preliminary injunction is an extraordinary remedy and involves the exercise of a far reaching power. Therefore, it should not be used except in a case clearly warranting it and will not be available unless the plaintiff carries its burden of persuasion as to all the prerequisites. To be entitled to injunctive relief, plaintiff has the burden of showing that (a) plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (b) the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on defendant; (c) the plaintiff has at least a reasonable likelihood of success on the merits; and (d) the granting of a preliminary injunction will not disserve the public interest. See, e.g., Pratte v. NLRB, 683 F.2d 1038 (7th Cir. July 8, 1982); Fox Valley Harvestore v. ·A. O. Smith Harvestore Prod., 545 F.2d 1096 (7th Cir. 1976); Eaton Corp. v. Appliance Valves Corp., 526 F.Supp. 1172 (N.D.Ind.1981), aff'd by order, 688 F.2d 842 (7th Cir. 1982).

The law is unsettled on whether state or federal law should apply in a diversity action seeking preliminary injunctive relief to ascertain the appropriate standard for granting or denying the equitable relief. In the case presently before the Court, federal law applies to all the claims based on federal statutes. Indiana case law accords with the federal law on the question of preliminary injunction and thus the same standards are applied to all claims in this case. See, Public Service Commission v. New York Central R. R. Co., 247 Ind. 411, 216 N.E.2d 716, cert. den., 385 U.S. 843, 87 S.Ct. 90, 17 L.Ed.2d 76 (1966).

3. Lafayette Beverage's Equity Agreement with Anheuser-Busch does not restrict the area in which Lafayette Beverage may sell its products but provides only for areas of primary responsibility. Designation of areas of primary responsibility have clearly been upheld under Section 1 of the Sher-

man Anti-Trust Act, 15 U.S.C. § 1. *Continental T. V., Inc. v. GTE Sylvania*, 433 U.S. 36, 54–55, 97 S.Ct. 2549, 2559–2560, 53 L.Ed.2d 568 (1977); *A. H. Cox and Co. v. Star Machinery Co.*, 653 F.2d 1302, 1306 (9th Cir. 1981). Designation of areas of primary responsibility by brewers is specifically authorized by Indiana regulations. 905 IAC 1–2010(3) (1979).

■ 4. Anheuser-Busch had no policy of restricting the geographic areas within which wholesalers can sell its products and Lafayette Beverage was never told that it could not sell Anheuser-Busch products outside its area of primary responsibility. At most, the evidence shows that Anheuser-Busch received complaints from a few Indiana wholesalers, including plaintiff, concerning transshipping and informed those wholesalers that there was nothing Anheuser-Busch could do about it. The Seventh Circuit and other federal courts, however, have recently reemphasized that the mere receipt of complaints from dealers combined with the manufacturer's termination of a dealer is not sufficient to establish concerted action as required to violate Section 1 of the Sherman Anti-Trust Act. Rather, it must be proven that the termination was in fact made in response to complaints in order to establish liability under Section 1. *Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir. 1982); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 743–44 (7th Cir. 1982); *Schwimmer v. Sony Corp. of America*, 677 F.2d 946, 953 (2d Cir. 1982); *Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786, 789–91 (5th Cir. 1982); *Battle v. Lubrizol Corp.*, 673 F.2d 984, 991–92 (8th Cir. 1982); *Blankenship v. Herzfeld*, 661 F.2d 840, 845 (10th Cir. 1981).

5. Lafayette Beverage has not demonstrated a likelihood of succeeding on the merits in establishing that Anheuser-Busch attempted to restrict the areas in which Lafayette Beverage could sell its products or that Lafayette Beverage was terminated for selling outside its area.

■ 6. Anheuser-Busch suggests resale prices to its wholesalers. It is well established, however, that a manufacturer is free to do so under Section 1 of the Sherman Anti-Trust Act. *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 53 (2th Cir. 1980); *Gray v. Shell Oil Co.*, 469 F.2d 742, 747 (9th Cir. 1972), cert. den., 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); *Klein v. American Luggage Works, Inc.*, 323 F.2d 787, 791 (3d Cir. 1963); L. Sullivan, *Handbook of the Law of Antitrust*, § 141 (1977); *Santa Clara Valley Distributing Co. v. Pabst Brewing Co.*, 556 F.2d 942, 945 (9th Cir. 1977); *Peter v. Union Oil Co.*, 328 F.Supp. 998, 1001–02 (C.D.Cal.1971). When suggesting prices, a supplier may engage in "exposition, persuasion and argument," on the appropriateness of prices suggested. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243, 260, n. 36 (E.D.Pa. 1979), aff'd, 637 F.2d 105 (3d Cir. 1980), cert. den., 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), (quoting *Gray v. Shell Oil Co.*, 469 F.2d 742, 747–48 (9th Cir. 1972), cert. den., 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973)).

7. Indiana is a uniform F.O.B. state and accordingly Anheuser-Busch sells its products to all of its Indiana wholesalers at the same price. Despite Anheuser-Busch's uniform pricing, wholesale prices to retailers vary dramatically throughout the state. The mere assertion by Mr. Lamb that he felt that he was "expected" to follow Anheuser-Busch's suggestions is wholly insufficient to show any likelihood of success on the resale pricing count of the complaint.

■ 8. Anheuser-Busch's termination of Lafayette Beverage was not a prohibited concerted refusal to deal under Section 1 of the Sherman Anti-Trust Act. A manufacturer is free to unilaterally decide with whom it will do business. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *A. C. Becken Co. v. Gemex Corp.*, 272 F.2d 1, 3 (7th Cir. 1959), cert. den., 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 876 (1960). A refusal to deal can violate Section 1 only if it is the result of collusive action between two or more distinct entities. *Albrecht v. Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968); *Valley Liquors, Inc. v. Renfield*

*Importers, Ltd.*, 678 F.2d 742, 744 (7th Cir. 1982); *Alloy International Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222, 1226, n. 6 (7th Cir. 1980); *Contractor Utility Sales Co. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1074 (7th Cir. 1981); *Wisconsin Liquor Co. v. Park & Tilford Distillers Corp.*, 267 F.2d 928, 931 (7th Cir. 1959); The record shows that Anheuser-Busch's decision to terminate Lafayette Beverage was made solely by Anheuser-Busch without consultation or collusion with any other person. Lafayette Beverage has not demonstrated a likelihood of success on the merits in establishing that Anheuser-Busch has engaged in a concerted refusal to deal.

■ 9. Lafayette Beverage's allegation that it was terminated as an Anheuser-Busch wholesaler for selling Miller products is insufficient to establish a violation of Section 1 in that the plaintiff did not allege that Anheuser-Busch acted in concert with anyone in taking such action.

■ 10. In order to prevail on a request for a preliminary injunction in an antitrust case, the plaintiff must not only show a reasonable likelihood of success on the merits but must also show that there is a casual connection between the antitrust violation and his termination. See, *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 293 (7th Cir. 1974). In the case presently before the Court, the record contains no evidence that Anheuser-Busch terminated Lafayette Beverage for reasons other than Lafayette Beverage's conduct regarding the sale of the overage Busch draught beer to Picadilly.

11. The substantive contract issues in this case are governed by the law of Indiana. See, *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

12. A contract between parties controls their legal relationship. 3A Corbin on Contracts, § 624 at 4 (1960). The plain meaning of the agreement's terms must be given effect absent clear evidence of the parties' contrary intention. *Hanley v. James McHugh Construction Co.*, 444 F.2d 1006, 1009 (7th Cir. 1971); *Heath v. A. B. Dick Co.*, 253 F.2d 30, 33–34 (7th Cir. 1958);

*Grant v. North River Insurance Co.*, 453 F.Supp. 1361, 1365–66 (N.D.Ind.1978); *Cincinnati Insurance Co. v. Mallon*, Ind.App., 409 N.E.2d 1100, 1103 (1980); *Ely v. State Farm Mutual Automobile Insurance Co.*, 148 Ind.App. 586, 268 N.E.2d 316, 319 (1971).

■ 13. In deciding cases involving disputes over the meaning of written contracts, Indiana courts resort to the application of rules of construction and the receipt of extrinsic evidence only after a careful review of the entire contract itself has failed to make clear its meaning. *Ethyl Corp. v. Forcum-Lannom Associates, Inc.*, Ind.App., 433 N.E.2d 1214 (1982); *Evansville-Vanderburgh School Corp. v. Moll*, 264 Ind. 356, 362, 344 N.E.2d 831, 837 (1976). In construing a written contract, the express language found within the four corners of the instrument, if unambiguous, determines the intent of the parties such that parol or extrinsic evidence is inadmissible to expand, vary or explain the instrument. *Ethyl Corp. v. Forcum-Lannom, Associates, Inc., supra; Lippeatt v. Comet Coal & Clay Co., Inc.*, Ind.App., 419 N.E. 1332 (1981); *Marksill Specialties, Inc. v. Barger*, Ind.App., 428 N.E.2d 65 (1981); *Piskorowski v. Shell Oil Co.*, Ind.App., 403 N.E.2d 838 (1980); *Jenkins v. King*, 224 Ind. 164, 171, 65 N.E.2d 121, 123 (1946); see, *Bellew v. Byers*, Ind., 396 N.E.2d 335, 337 (1979). Further ambiguity is not established by the mere fact the parties assert different interpretations of the contracts. *Ethyl Corp. v. Forcum-Lannom Associates, Inc., supra; Marksill Specialities, Inc. v. Barger, supra; Equitable Life Assurance Society of U. S. v. Short*, 165 Ind.App. 338, 332 N.E.2d 273 (1975). In determining whether an ambiguity exists words used in a contract must be given their common meaning. *Ethyl Corp. v. Forcum-Lannom Associates, Inc., supra; Marksill Specialties, Inc. v. Barger, supra; Piskorowski v. Shell Oil Co., supra.*

14. The language of the Equity Agreement is clear and unambiguous regarding termination and, therefore, requires no interpretation. The principal rule of contract interpretation is to apply the clear terms of

the contract; where no ambiguity exists, the remaining principles of contract interpretation do not even come into play. *Ethyl Corp. v. Forcum-Lannom Associates, Inc., supra; Lippeatt v. Comet Coal & Clay Co., supra.* In *Ethyl Corp.*, the court held: "While an ambiguous adhesion contract is construed in the non-draughting party's favor, an unambiguous contract must be enforced according to its terms." 433 N.E.2d at 1217.

15. The Equity Agreement in this case is not an adhesion contract entered into by grossly disparate bargaining powers. Mr. James Lamb has been involved in the beer wholesaling business nearly all of his· life. Moreover, Mr. Lamb did not read the Equity Agreement prior to signing the Agreement. Lafayette Beverage applied to become an Anheuser-Busch wholesaler; Anheuser-Busch did not seek out Lafayette Beverage. Lafayette Beverage had the benefit of legal counsel when it entered into the Equity Agreement with Anheuser-Busch. Lafayette Beverage was a healthy company and a good business when it entered into the agreement. See *Vernon Fire & Casualty Ins. Co. v. Thatcher*, 260 Ind. 55, 292 N.E.2d 606 (1973).

16. Paragraph 6(c) of the Equity Agreement specifically provides for immediate termination for "Fraudulent conduct of wholesaler in any of its dealing with Anheuser-Busch or its Products." The conduct of Lafayette Beverage in connection with the sale of the 82 half-barrels of Busch draught beer to Picadilly constitutes fraudulent conduct with respect to Anheuser-Busch and its products within the meaning of the Equity Agreement. Anheuser-Busch was justified in terminating Lafayette Beverage under the Equity Agreement.

17. Anheuser-Busch did not waive its contract right to terminate Lafayette Beverage. Waiver is an intentional relinquishment of a known right involving both knowledge of the existence of the right and intention to relinquish it. *Conner v. Fisher*, 136 Ind.App. 511, 202 N.E.2d 572, 575 (1964) (*quoting Shelt v. Baker*, 79 Ind.App. 606, 137 N.E. 74 (1922)). *Lafayette Car Wash,*

*Inc. v. Boes*, 258 Ind. 498, 282 N.E.2d 837, 839 (1972). The evidence does not support the claim that Anheuser-Busch relinquished its contract rights against Lafayette Beverage. Plaintiff claims that Anheuser-Busch indicated by silence that it intended to waive its rights under the Equity Agreement by failing to inform Lafayette Beverage for four months that it would be terminated. "Mere silence, acquiescence or inactivity is not waiver unless there was a duty to speak or act." *American National Bank & Trust Co. v. St. Joseph Valley Bank*, Ind.App., 391 N.E.2d 685, 687 (1979). Anheuser-Busch was not under a duty to speak. Nevertheless, Anheuser-Busch did inform Lafayette Beverage that its termination was under consideration and clearly did not waive its rights under the Equity Agreement with Lafayette Beverage.

18. Plaintiff's contention that Anheuser-Busch is estopped from enforcing its rights under the Equity Agreement is equally lacking in merit. The elements necessary to establish equitable estoppel are:

(1) A representation or concealment of material facts; (2) The representation must have been made with knowledge of the facts; (3) The party to whom it was made must have been ignorant of the matter; (4) It must have been made with the intention that the other party should act upon it; (5) The other party must have been induced to act upon it.

*State ex rel. Crooke v. Lugar*, 171 Ind.App. 60, 354 N.E.2d 755, 765 (1976) (*quoting Emmco Insurance v. Pashas*, 140 Ind.App. 544, 551, 224 N.E.2d 314, 318 (1967)). Lafayette Beverage has failed to meet its burden of establishing these elements. First, Anheuser-Busch did not misrepresent or conceal any material facts. Anheuser-Busch did not inform Lafayette Beverage of its termination prior to May 20, 1982 because the final decision on the termination by top management had not been made until then. Second, Mr. Rogers, who had contact with Lafayette Beverage could not make representations or conceal facts as to Lafayette Beverage's termination with "knowledge" of the facts because the ulti-

mate decision to terminate was not his. He had made his recommendation and the matter was entirely out of his hands. Third, as noted above, Lafayette Beverage was specifically made aware that Anheuser-Busch's top management would probably terminate its relationship with Lafayette Beverage. Finally, Anheuser-Busch did not misrepresent or conceal any facts and consequently Lafayette Beverage could not have been induced to act in reliance.

19. Lafayette Beverage has not shown a reasonable likelihood of success on the merits of its claim of equitable estoppel or laches.

■ 20. The Indiana Alcoholic Beverage Act provides that a brewer may not terminate his agreement with an Indiana wholesaler "unfairly and without due regard for the equities of the other party." Ind.Code § 7.1–5–5–9(2) (1976). The facts establish that Anheuser-Busch has consistently acted in a manner that insured the fairness and due regard for the equities required by the Indiana statute. Anheuser-Busch did not make its decision to terminate rashly, but only after considerable deliberation on the part of Anheuser-Busch and a thorough investigation in which all the facts were fully documented and it is clear that Lafayette Beverage engaged in fraudulent conduct. While Anheuser-Busch had an unequivocal contract right to terminate plaintiff immediately, Lafayette Beverage was given 30 days to discontinue the Anheuser-Busch part of its business in an orderly fashion. Anheuser-Busch distributes its products through wholesalers located throughout the United States. Anheuser-Busch has an obligation to treat those wholesalers equitably and not to discriminate against them. Lafayette Beverage was terminated for its fraudulent conduct in breach of the Equity Agreement and not for its own convenience. Lafayette Beverage has failed to establish a reasonable likelihood of success on the merits on its claim under I.C. § 7.1–5–5–9.

■ 21. Anheuser-Busch did not seek to control the internal affairs of Lafayette Beverage in violation of Ind.Code § 7.1–5–

9–2 and Ind.Code § 7.1–3–3–18 (1976). Ind. Code § 7.1–5–9–2 provides:

> It is unlawful for the holder of a brewer's permit to hold, acquire, possess, own, or control, or to have an interest, claim or title, in or to an establishment, company, or corporation holding or applying for a beer wholesaler's permit under this title, or in its business.

Ind.Code § 7.1–3–3–18 provides:

> The transfer, sale, acquisition, assignment, control of, or beneficial interest, direct or indirect, in or to a beer wholesaler's permit, or in its business, or in its corporate stock by a brewer contrary to the provisions of IC 1971, 7.15–9–2, or the transfer, assignment upon the capital stock book, or other corporate record, of a corporation holding a beer wholesaler's permit, of the capital stock, or a part of it, is wholly void and not capable of validation.

It is clear on the face of the statutes that neither has any application to the issues raised here. These statutes prohibit a brewer from owing or having a controlling interest in a wholesaler. Anheuser-Busch's policy is to treat its wholesalers as independent businessmen and has made no effort to control the internal affairs of Lafayette Beverage. Any control exercised by Anheuser-Busch over Lafayette Beverage was necessary to maintain the quality and integrity of the Anheuser-Busch products. Cf. *Jos. Schlitz Brewing Co. v. Central Beverage Co.*, 172 Ind.App. 81, 359 N.E.2d 566 (1977).

■ 22. Anheuser-Busch did not grant Lafayette Beverage a "franchise" within the meaning of the Indiana Franchise Disclosure Act. To establish a franchise under that Act, Lafayette Beverage must prove that it paid Anheuser-Busch a "franchise fee." Ind.Code § 23–2–2.5–1(a)(3). Although the required fee may be paid "directly or indirectly," Anheuser-Busch has not required that a fee be paid in any form. Id. at (i). Plaintiff contends that Anheuser-Busch charged Lafayette Beverage a franchise fee by conditioning Lafayette Beverage's receipt of Budweiser Light on

an agreement to spend $4000 and other amounts on promotional activities for Budweiser Light. The record, however, shows that the receipt of Budweiser Light was not conditioned on the payment of any funds. Lafayette Beverage freely agreed to commit money to the promotion of Budweiser Light, which would have been given to Lafayette Beverage even if it did not commit any money whatsoever.

23. Termination of a wholesaler in and of itself does not per se constitute irreparable injury. See, *e.g., Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.,* 545 F.2d 1096 (7th Cir. 1976). As the court held in *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755 (2d Cir. 1979), a distributor in plaintiff's position is easily remedied at law:

> Cutting through the morass of unsupported allegations of irreparable damage, the essence of Kahn's claim is for the loss of the alleged profitable business of selling Baldwin pianos, organs and other musical instruments. There is no doubt that any such loss is provable. So also, even if we take at face value Kahn's statement that it had "expended large sums promoting and advertising Baldwin's products," all these are clearly also provable as part of Kahn's damages, if the cancellation was wrongful.

*Id.* at 763.

24. An alleged injury is not "irreparable" if there exists an adequate legal remedy. *American Hospital Ass'n v. Harris,* 625 F.2d 1328, 1331 (7th Cir. 1980); *A. O. Smith Corp. v. FTC,* 530 F.2d 515, 527 (3d Cir. 1976). Proof of inadequate legal remedy is a "separate" prerequisite to preliminary relief. *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 n.1 (7th Cir. 1976). Lafayette Beverage can prove, in dollar amounts, the damage, if any, to Lafayette Beverage's reputation, good will and economic harm it would suffer from the loss of Anheuser-Busch products. Furthermore, Anheuser-Busch products constitute only approximately 28% of Lafayette Beverage's sales and was a successful wholesaler without Anheuser-Busch products prior to the merger in which it acquired Anheuser-Busch products.

25. Lafayette Beverage also has an adequate remedy at law for its alleged antitrust injuries. See, *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 567, 101 S.Ct. 1923, 1929–1930, 68 L.Ed.2d 442 (1981); *Zenith Radio Corp. v. Hazeltine Research Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). Although "difficulty of ascertaining damages with certainty is a proper test of irreparable harm . . . on antitrust cases, the courts have allowed the plaintiff a broad latitude in establishing proof of damages." *Triebwasser & Katz v. AT&T,* 535 F.2d 1356, 1359 (2d Cir. 1976) (citations omitted). *Accord, Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 879 (7th Cir. 1970), *cert. den.,* 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). Not only are the antitrust laws precisely tailored to compensate Lafayette Beverage for all alleged injuries, but treble damages are available if Lafayette Beverage were to establish any of its antitrust claims.

26. Lafayette Beverage has failed to establish that any of the injuries it alleges it will suffer from the loss of the Anheuser-Busch brands are irreparable and that it has no adequate remedy at law.

27. The balance of harm in this case tips decidedly in favor of Lafayette Beverage.

28. Lafayette Beverage has failed to demonstrate that the granting of a preliminary injunction will further the public interest. The basis of the termination of Lafayette Beverage was fraudulent conduct which affects not only Anheuser-Busch but the public as well. See, *Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131 (D.Colo.1980).

On the basis of the foregoing findings of fact and conclusions of law, plaintiff's Motion for Preliminary Injunction is hereby

DENIED. Each party is to bear their own costs. SO ORDERED.