STATE OF INDIANA ON THE RELATION OF PAUL F. CROOKE AND
EARL BOOTH, RETIRED POLICE OFFICERS ET AL. *v.* RICHARD
G. LUGAR, MAYOR OF THE CITY OF INDIANAPOLIS ET AL.

[No. 2-375A49.  Filed September 29, 1976.  Rehearing denied
October 21, 1976.  Transfer denied June 29, 1977.]

*Rex P. Killian, John C. Ruckelshaus, Ruckelhaus, Bobbitt & O'Connor,* of Indianapolis, for appellants.

*Gary R. Laudau,* Corporation Counsel, of Indianapolis, *William L. Soards,* of Indianapolis, for appellees.

SULLIVAN, J.—The judgment below denied overtime pay to Indianapolis police officers for hours worked beyond 40 hours per week prior to March 22, 1970.

On September 1, 1970, the plaintiffs-appellants, acting and retired Indianapolis police officers and the Fraternal Order of Police, (hereinafter Crooke) individually and on behalf of all others similarly situated, commenced this action for mandate. They sought remuneration from the defendants-appellees (hereinafter City) for overtime allegedly worked without pay from January 1, 1958 to March 22, 1970. With the exception of testimony by Winston Churchill, former Chief of Police of Indianapolis, all evidence was before the court through stipulation.

Administration of municipal police force matters has been delegated to local governments by the Indiana General Assembly. *See* Ind. Ann. Stat. 18-1-11-1 *et seq.* (Burns Code Ed. 1974). 18-1-11-2 provides that "[t]he annual pay of all policemen . . . shall be fixed by ordinance of the common council . . . ." The Indianapolis City Council accordingly established a pay scale on an annual basis for the members of its police department.

Restrictions on the exercise of authority over police by cities are found in Ind. Ann. Stat. 19-1-1-1 *et seq.* (Burns Code Ed. 1974), including a limitation upon the maximum work week in 19-1-16-1 as follows:

"Police—Work time—Exceptions—Court appearances—No member of the police department or police force of any city in the State of Indiana having a regularly organized and

paid police department or police force, shall be required, except in case of public emergency as determined by the mayor, to work in excess of six [6] days of eight [8] hours each in any one [1] week, or not more than an average of forty-eight [48] hours per week in any one [1] calendar year: Provided, however, That this chapter [19-1-16-1] shall not apply to the chief of police, chief of detectives, superintendent of the police department or matrons of any such departments."

This statutory provision was passed in 1947.

Pursuant to its authority to regulate the police department, the Indianapolis City Council enacted General Ordinance #113 (§ 3-1101 of the Municipal Code), effective January 18, 1958. That Ordinance reads in pertinent part:

"Section 1. On and after the passage of this Ordinance an average of forty (40) hours work week shall be established and shall constitute the regular work week for all regular members of the Indianapolis Police Department, except in case of public emergency, as determined by the Mayor, and provided further, that this Ordinance shall not apply to the Chief of Police or the Chief of Detectives or Inspectors."

Despite this ordinance, the regular average work week for police officers from January 1, 1958 to March 22, 1970 was 42 hours per week, scheduled on the basis of a 28 day monthly slate with an individual working 21 days on and 7 days off, each working day being 8 hours. Overtime was paid only for work in excess of 48 hours per week. In the years 1966, 1967, and 1968, the compensation for overtime was determined by dividing the officer's annual salary by 2,184 hours, that figure being based on a 42-hour week. From 1969 to the present, the overtime figure has been calculated by dividing the officer's annual salary by 2,080 hours, based on a 40-hour week.

In 1966, the City Council enacted G.O. #150 (§ 3-1102 of the Municipal Code), effective November 22, 1966, which reads as follows:

"Section 1. There has been reported by the Chief of Police of the City of Indianapolis to the Board of Public Safety or said City that there exists a shortage of per-

sonnel and that there is need for added personnel from time to time to enforce the laws of the State of Indiana and the City of Indianapolis and that the public welfare and safety could be promoted by additional manpower. That the existing statutes of the State of Indiana authorized a stipulated work week and the City cannot enforce additional services from the members of its Police Department unless they voluntarily choose to serve over and beyond the statutory time limit or unless an emergency exists.

Section 2. It appearing from information furnished to the City Controller and the Board of Public Safety that a number of the personnel of the Indianapolis Police Department would voluntarily choose to serve additional hours over and beyond the statutory requirement for their services as police officers if proper compensation and remuneration were to match and be available for such services.

Section 3. The City Controller, The Board of Public Safety and the Chief of Police by virtue of the foregoing facts are hereby expressly authorized to accept the voluntary services of all police personnel who are regular members of the Indianapolis Police Department to serve in the field beyond the statutory hours required of them and also to accept the services of all personnel of the Police Department in the data processing communication function of the Indianapolis Police Department and such overtime employment shall be strictly limited to these three purposes. The pay for such overtime shall match the regular wage schedule of such personnel and shall amount to the same hourly basis as they are paid during their regular services in said Department.

Section 4. The funds to pay for the services of such voluntarily rendered overtime services by members of the Indianapolis Police Department shall be paid out of the unused balances in Fund 11, Salaries and Wages, Services Personal, Indianapolis Police Department, a Division of the Department of Public Safety of the City of Indianapolis and should the budgeted monies in said Fund 11 expire or be reduced to the point where no such funds remain, then such overtime shall cease and the Chief of Police shall order no further overtime services if monies in Fund 11 be not available for such purposes.

Section 5. The City Controller shall maintain a running record of the balance remaining in said Fund 11 and shall advise the Chief of Police at any time of the nonavailability of additional funds for overtime purposes, and upon such notification by the City Controller to the Chief of Police,

overtime services in any year where available funds become lacking, such overtime shall automatically cease. This ordinance requires no additional appropriation but merely the use of existing funds already appropriated and available and the Clerk is accordingly advised that the procedure for additional appropriation shall not be followed pertaining to this ordinance.

Section 6. The Chief of the Indianapolis Police Department shall ask for volunteers in his Department and shall cause to be prepared a list of available officers who are willing to work voluntarily beyond the regular forty-two (42) hour work week and shall as near evenly as possible award overtime police employment (a) in the field, and (b) in the Data Processing and Communication Division to available rank and file members of his Department.

Section 7. This ordinance shall be in full force and effect from and after its passage, approval by the Mayor, and upon notification by the City Controller to the Chief of Police that the overtime Police employment in the field and in the data processing and communication divisions may begin."

The ambiguity and inconsistency of these two ordinances have generated the dispute in this appeal. Winston Churchill, Chief of Police from February 1968 to April 1974, the only witness called, testified that at the beginning of his administration the regular work week was 42 hours. He knew that the 1958 ordinance established a 40-hour week, but did not implement it, since switching to a 40-hour week would have meant a manpower loss of more than 100,000 hours per year.

In March of 1970 Michael T. Sergi, President of the Fraternal Order of Police, and his attorney met with Churchill to tell him they planned to file suit regarding the 42-hour work week. Churchill subsequently had meetings with the Director of Public Safety and the City corporation counsel. They determined that it would be necessary to change to a standard 40-hour week. This was done March 22, 1970, earmarking unused salary monies from Fund 11 (a budgetary item) to pay for overtime in excess of forty hours. The plan is still in effect. Churchill further testified that the Council

had done nothing to change the 1970 policy determination to pay overtime for work over 40 hours per week, and that the Council did in fact help by partially funding the overtime.

Crooke's and City's arguments revolve around their conflicting interpretations of the 1958 and the 1966 ordinances. Crooke maintains that the 1958 ordinance mandates a 40-hour week, and implicitly promises payment for hours worked over 40 hours. The enactment in 1966 specifically authorized such overtime payments. City, on the other hand, argues that the 1958 ordinance was merely an attempt to regulate the hours worked by police officers and it in no way authorized the payment of overtime; that the 1966 ordinance did not authorize overtime in this situations; and that Ind. Ann. Stat. 19-1-16-1, *supra* establishes a 48-hour work week for police officers, thus preempting and rendering void the 1958 and 1966 ordinances insofar as they might be construed to provide for overtime pay for less than 48 work hours.

We are confronted with two issues on review:

(1) Whether general ordinances of the City provide for overtime police pay between 1958-1966 and 1966-1970.

(2) Whether laches or estoppel prevent recovery of overtime pay for either or both such periods.

## I.

## ENTITLEMENT OF POLICE OFFICERS TO OVERTIME PAY

We agree with Crooke that two distinct time periods are involved. From G.O. 113's effective date of January 18, 1958, until November 22, 1966, the date G.O. 150 became effective, Crooke must rely upon theories of quantum meruit, implied contract, and ratification to recover payment for overtime hours allegedly worked. From November 22, 1966, when G.O. 150 authorized payment of overtime to police officers, until March 22, 1970, when a 40-hour work week was insti-

tuted, Crooke may additionally argue that payment of overtime was legislatively mandated.

### A.   January 18, 1958—November 22, 1966.

In 1958 ordinance established a 40-hour work week for all regular members of the Indianapolis police department. It was completely ignored until March 22, 1970. Although officers worked only 8-hour days, the mechanics of a 28-day monthly calendar with 21 days on and 7 days off meant that each officer was working three 40-hour weeks and one 48-hour week every 28 days, or in effect working an average 42 hours per week.

The essence of Crooke's argument is that the 1958 40-hour ordinance became part of the employment contract between the City and the police officers, and implicitly promised payment for overtime hours worked. City answers that the 1958 ordinance was merely an attempt to regulate the hours worked by police officers and in no way authorized or promised payment for work in excess of 40 hours.

Members of the Indianapolis police department are employees rather than officers. Their relationship with the City is purely contractual. *State ex rel. Palm* v. *City of Brazil* (1947), 225 Ind. 308, 315, 73 N.E.2d 485, 488. One writer has stated the general rule that municipal employees cannot be compensated for overtime work absent a valid contract or law authorizing the payment of overtime. *4 McQuillan, Municipal Corporations,* § 12.194a, p. 84 (1968 Revised Volume). It has also been stated, however, that members of the police and fire departments who serve more hours than those stipulated in their employment contract are entitled to overtime pay. *See, City of Galveston* v. *O'Mara* (1941 Tex. Civ. App.), 146 S.W.2d 416, *aff'd* 138 Tex. 16, 155 S.W.2d 912; 62 C.J.S. Municipal Corporations § 586, p. 1188.

Numerous Indiana cases have held that *officers* may collect only the remuneration allowed by law, and that any "extra" duties performed by an officer are presumed either to be covered by that salary or rendered gratuitously. *Applegate* v. *State* (1933), 205 Ind. 122, 185 N.E. 911; *City of Brazil* v. *McBride* (1879), 69 Ind. 244; *City of East Chicago* v. *Seuberli* (1941), 108 Ind. App. 581, 31 N.E.2d 71; *City of Indianapolis* v. *Lamkin* (1916), 62 Ind. App. 125; 112 N.E. 833. Since *employees* have a contractual relationship with municipal corporations, however, it has been held that principles of contract law apply as if both parties were private persons, unless the contract is prohibited by statute or public policy. *City of Decatur* v. *McKean* (1906), 167 Ind. 249, 78 N.E. 982; *City of Logansport* v. *Dykeman* (1888), 116 Ind. 15, 17 N.E. 587; *Heeter* v. *Western Boone County Community School Corp.* (1970), 147 Ind. App. 153, 259 N.E.2d 99. Thus under the proper circumstances, a person employed by a municipality may recover additional compensation for extra services rendered, regardless of compliance with formalities, if the services were rendered under an express or implied contract. *City of Logansport* v. *Dykeman* (1888), *supra;* *Board of Com'rs of County of Lake* v. *Dedelow, Inc.,* (1974), 159 Ind. App. 563, 308 N.E.2d 420; *Heeter* v. *Western Boone County Community School Corp., supra; Reed* v. *Town of Orleans* (1890), 1 Ind. App. 25, 27 N.E. 109. Of particular interest is *Schroeder* v. *City of New Albany* (1930), 91 Ind. App. 62, 170 N.E. 83, in which the appellant sought overtime pay for alleged extra hours worked as a member of the New Albany fire department. He was paid the regular wages, but he alleged that he worked both day and night shifts and was therefore entitled to compensation for the extra shift. His suit was dismissed on two grounds: (1) that his complaint did not show that there were existing and unexpended appropriations at the time the express or implied contract had been entered into; and (2) that the complaint showed neither a contract to pay for the extra services nor facts from which

an implied contract could be inferred. The court held that there was a presumption that the appellant either volunteered his services or that the salary paid was intended to compensate him for the extra work. Thus it appears that under Indiana law, in the proper circumstances, police officers may recover compensation for overtime work on theories of implied contract, ratification, or quantum meruit, even without statutory authorization for the payment of overtime if there are funds appropriated and available for that purpose.

Considering the facts before us, we hold that Crooke has not established sufficient facts to support a claim for compensation for the extra two hours worked per week from January 18, 1958 to November 22, 1966. An implied contract, like all contracts, requires a meeting of the minds. The circumstances must justify an inference that extra compensation was contemplated by both parties. In *Pittsburgh etc. R. Co.* v. *Marable* (1919), 189 Ind. 278, 280-82, 126 N.E. 849 at 849-50 our Supreme Court said:

> "Under some circumstances a person employed to perform services for a stated remuneration during a specified period may be entitled to recover additional compensation for extra services rendered at the request of his employer, even though the contract of employment makes no provision for such extra compensation. The right to such extra compensation, however, depends on the existence of a contract to that effect, either express or implied. Ordinarily a request for the performance of services gives rise to an implied offer to pay what such services are reasonably worth, and the rendition of such services in response to the request amounts to an acceptance of the offer, thus concluding the implied contract; but this rule does not apply where the services are performed by one who is in the employ of the person making the request. In such a case the request of the employer does not justify the inference of an offer to pay anything in addition to the compensation provided by the contract, for the reason that it is assumed that such services were requested and performed under the contract of employment.
>
> The effect of this doctrine as applied to a case in which an employe seeks to recover from his employer compensa-

tion for extra work performed during the period covered by a special contract of employment is to place on the plaintiff the burden of proving that the employer either expressly or impliedly promised to pay extra compensation for the services requested. In a case of this kind it is not sufficient to establish merely that services outside of the ordinary employment were requested by the employer and performed by the employe. The plaintiff must go further and prove that the services requested were of such a character and were rendered under such circumstances as would lead to the conclusion that a servant performing such services would be reasonably justified in the belief that he would be allowed additional compensation therefor, and that an employer making such request would be reasonably expected to know that additional compensation would be expected. In other words, the character of the work requested and the circumstances attending the request and performance must be shown to be of such a nature as to justify the inference that extra compensation was contemplated by both employer and the employe."

Crooke and his fellow officers were never requested to do the kind of extra work for the City which has led courts in the past to find an implied contract for payment of services rendered. In *City of Decatur* v. *McKean, supra,* McKean was hired by the common council as a special engineer when the city engineer died. He performed all the work he was hired to do, and the court held he was entitled to payment under the contract terms. In *Williams* v. *Bent* (1949), 119 Ind. App. 374, 87 N.E.2d 883, Bent, a tax consultant under contract to Williams, was allowed to collect for services he rendered to a second business formed by Williams despite the absence of any express agreement that he would receive payment for his services to the second business. Finally, in *Crider* v. *State* (1972), 258 Ind. 541, 282 N.E.2d 819, Crider, a trustee, was convicted of violating a statute making it illegal for a town trustee to contract with the city. The Supreme Court held that although no formal contract had been entered, a vote by the Board of Trustees hiring Crider as a sewer construction inspector was sufficient to bind the city to pay for services performed at its request.

Nothing in the record before us suggests that the City of Indianapolis through the adoption of the 1958 ordinance was requesting its police officers to perform extra work or that it was expressly or impliedly promising to pay for extra services. We find no circumstances from which an agreement could be implied. Therefore, the presumption that either the extra two hours per week were volunteered or that the officers' annual salary was intended to compensate for the extra work controls. *Schroeder* v. *City of New Albany, supra.*

Nor is Crooke entitled to recover on a quantum meruit theory. While it is true that the police rendered services which benefited the City and the City knowingly accepted the services, the presumption that the annual salary fully compensated for those services defeats a claim in quantum meruit. This is not a situation like that in *Heeter* v. *Western Boone County Community School Corp., supra,* where a person with no prior contractual relationship with the city performed services at the city's request and for the city's benefit.

For the same reason the ratification claim must fail. Ratification occurs when there is a knowing acceptance of an unauthorized employment. *National Life Ind. Co.* v. *Headrick* (1916), 63 Ind. App. 54, 112 N.E. 559. Here, the employment of the police officers was authorized, and they were paid for their services.

We hold that they are not entitled to extra compensation for any overtime prior to November 22, 1966.

### B.    November 22, 1966—March 22, 1970.

Since the 1966 ordinance was in effect during this period, Crooke argues that there was legislative authorization for the payment of overtime to the police officers. The ordinances does clearly provide for the payment of overtime. What constitutes overtime work, however, is far from clear from the ordinance's inartful provisions. Construing it as a whole and

in light of existing employment practices we hold that the 1966 ordinance does not entitle the officers to overtime payments for the hours worked between 40 and 42 hours per week during the period from November 22, 1966 to March 22, 1970.

Crooke points to a number of the ambiguities in the poorly drafted ordinance and suggests that we construe it to mandate payment of overtime for more than 40 hours of work per week. Paragraph one of the ordinance refers to a "stipulated work week" authorized by state statute beyond which officers cannot be required to work. This must refer to 19-1-16-1, *supra*, which sets a maximum work week of 48 hours, for it is the only state statute regulating the work week for police officers. Paragraph two recognizes that a number of officers "would voluntarily choose to serve additional hours over and beyond the statutory requirement for their services as police officers . . ." if they received extra compensation. It is unclear whether the ordinance is referring to 19-1-16-1, *supra,* or to the 1958 ordinance when it speaks of "the statutory requirement for their services." Again, it is unclear as to what "statutory" hours the council was referring. Finally, paragraph six refers to the "regular forty-two (42) hour work week." According to the stipulated facts, 42 hours was the "regular" week set by departmental requirement, not by statute. Crooke maintains that paragraph six merely sets forth the procedural aspect of how overtime should be paid, and not the substantive right to overtime, and suggests that the reference to 42 hours must be an inadvertent error. He argues that the 40-hour week specifications of the 1958 ordinance should be read into the 1966 ordinance.

If both ordinances were read in a vacuum, we might find ourselves in agreement with Crooke. However, we know that the 42 hour work week had been in effect for a number of years, and we have held that the annual salary paid to police officers was intended to compensate them for the entire 42 hours worked. The express words of the 1966 ordinance

provide for voluntary overtime employment in excess of 42 hours. The most plausible interpretation to be placed on the ordinance is that the City Council intended that police officers be paid overtime for hours worked in excess of the established work week, which at that time was 42 hours. Thus, there is no "statutory" provision that the officers be paid extra compensation for 2 hours per week in excess of 40 hours as claimed for the period from November 22, 1966 to March 22, 1970.

We are not unaware of the fact that the members of the Indianapolis police department were required to work 2 hours per week in violation of the City's own ordinance mandating a 40-hour work week. The appropriate remedy for that violation, however, would have been a suit to compel compliance with the ordinance rather than this long after-the-fact assertion that the 1958 ordinance implied the formation of a new employment contract. Indeed, when Winston Churchill, the Chief of Police, was informed in March of 1970 that a suit to compel compliance was contemplated, the standard work week was changed to 40 hours. Crooke argues that Churchill's interpretation of the 1958 ordinance as mandating a 40-hour work week, the implementation of the 40-hour week in 1970 after threat of lawsuit, and the City Council's acquiescence in that implementation, leads inescapably to the conclusion that the officers are entitled to overtime pay for those 2 hours per week worked prior to the change.

In making this argument, Crooke refers to a legal theory ". . ." that an administrative interpretation should be given considerable weight in interpreting an ordinance plus the additional factor that there had been legislative inaction from the date of said interpretation to the date of trial, a period in excess of four years, which gives further weight and credence to the administrative interpretation." (App. Br. p. 31). Crooke cites no authority to support this "legal theory", which is in fact a subtle variation of the well-

established rule ". . . that a long adhered to administrative interpretation dating from the legislative enactment, with no subsequent change having been made in the statute involved, raises a presumption of legislative acquiescence which is strongly persuasive upon the courts." *Baker* v. *Compton* (1965), 247 Ind. 39, 42, 211 N.E.2d 162, 164; *Whirlpool Corp.* v. *State Board of Tax Comm'rs* (1975), 167 Ind. App. 216, 338 N.E.2d 501.

Prior to the 1970 change in the standard work week, there was no administrative interpretation of the 1958 ordinance. The 1970 change, made four years after the enactment of the 1966 overtime ordinance, constitutes the interpretation relied upon by Crooke. The rule of *Baker* v. *Compton, supra,* is therefore inapplicable.

Crooke's "administrative interpretation" argument is somewhat ambiguous. He may be arguing that the administrative change in the work week made in 1970 coupled with the city council's acquiescence in that change is an admission by the City that the 1966 ordinance promised payment for all hours worked in excess of 40 hours per week, even though that ordinance assumed a "regular forty-two (42) hour work week." We do not attach this significance to the change in the regular work week in 1970.

To reach the result urged by Crooke it would be necessary to construe the 1966 ordinance as incorporating the 1958 ordinance. We declined to do so in our holding that the 1966 ordinance intended only to pay overtime compensation to those officers who worked in excess of 42 hours per week. The 1970 change merely implemented the long-neglected 1958 ordinance establishing the 40-hour work week. Having made that change, it was not unreasonable for the City to continue to follow its policy of compensating police officers for hours worked in excess of the regular work week, now 40 hours rather than 42 hours.

We are troubled, however, by the fact that the police officers were not compensated for overtime hours during the entire disputed period (1958-1970) unless they worked in excess of 48 hours per week. This practice clearly violated the promise of the 1966 ordinance that overtime would be paid for work in excess of 42 hours per week if funds were available, and thus is a breach of the officers' contracts of employment. We hold, therefore, that those officers who worked between 42 and 48 hours per week without extra compensation during the period from November 22, 1966, to March 22, 1970, are entitled to recover such overtime pay.

## II.

### LACHES AND ESTOPPEL

The trial court held that Crooke was barred from recovery by the doctrine of laches and estoppel. The equitable defense of laches contains three elements: (1) inexcusable delay in asserting a right; (2) implied waiver arising from knowing acquiescence in existing conditions; and (3) circumstances causing prejudice to the adverse party. *Citizens National Bank of Grant County v. Harvey* (1976), 167 Ind. App. 582, 339 N.E.2d 604, 611.

The facts necessary to establish equitable estoppel were defined in *Emmco Insurance* v. *Pashas* (1968), 140 Ind. App. 544, 224 N.E.2d 314 as follows:

"(1) A representation or concealment of material facts; (2) The representation must have been made with knowledge of the facts; (3) the party to whom it was made must have been ignorant of the matter; (4) It must have been made with the intention that the other party should act upon it; (5) The other party must have been induced to act upon it." 140 Ind. App. at 551, 224 N.E.2d at 318. *See,* also, *Sheraton Corp. of America* v. *Kingsford Packing Co., Inc.* (1974), 162 Ind. App. 470, 319 N.E.2d 852, 856.

Applying these principles to the facts before us, we hold that the claim for overtime pay for the hours worked in

excess of 42 hours per week after November 22, 1966, is not barred by either laches or estoppel. We see no implied waiver on the part of the police officers, nor has the City shown that it was prejudiced by the conduct of the officers. During oral argument of the cause, the City implied that it had been prejudiced by Crooke's delay in asserting the overtime claim in that the unused balances of "Fund 11", as the only source for payment of overtime, have long since been expended for other salary, wage, and personal service obligations. The record is devoid of proof of such expenditures. Moreover, we do not deem such to constitute sufficient prejudice so as to invalidate Crooke's claim in its entirety. The record is completely silent as to the current availability of funds to pay for overtime owing for the 1966 to 1970 period. *See, City of Lafayette* v. *Keen* (1943), 113 Ind. App. 552, 48 N.E.2d 63. While we recognize that the application of laches is within the sound discretion of the trial court, *(Citizens Nat'l Bank of Grant Cnty.* v. *Harvey, supra)* it is obvious that the court based its decision on the entire claim dating back to 1958. Since we are concerned here only with the claim dating from 1966 for overtime between 42 and 48 hours, we feel that the trial court abused its discretion in applying laches and estoppel.

The judgment of the trial court is affirmed except insofar as it denied relief to those officers who worked between 42 and 48 hours per week from November 22, 1966 to March 22, 1970 without extra compensation. As to those officers, the judgment is reversed and the cause remanded for a determination of damages due.

Buchanan, P.J., and White, J., concur.

NOTE.—Reported at 354 N.E.2d 755.