**In re The SASSI CORPORATION, Debtor.**

**ANDSU, INC. and Merchants National Bank & Trust Company of Indianapolis, Plaintiffs,**

**v.**

**The CITY OF KOKOMO, Defendant.**

**Bankruptcy No. IP81–2795RA.**
**Misc. No. 83–92.**
**Adv. P. No. 83–526.**

United States Bankruptcy Court,
S.D. Indiana,
Indianapolis Division.

Sept. 30, 1983.

Hans W. Steck, Richard W. Fields, Bingham Summers Welsh & Spilman, Indianapolis, Ind., for Andsu, Inc.

Thomas W. Dinwiddie, Wooden McLaughlin & Sterner, Indianapolis, Ind., for Merchants Nat. Bank and Trust Co.

Leonard Opperman, James S. Kowalik, Hopper & Opperman, Indianapolis, Ind., for City of Kokomo.

### ENTRY

ROBERT L. BAYT, Bankruptcy Judge.

This matter first came before the Bankruptcy Court on the plaintiffs' Motion to Interpret and Reconcile any Inconsistency between Debtor's Amended Plan of Reorganization and a Contract with the City of Kokomo and to Order Specific Performance of Acts by the City of Kokomo Necessary for the Consummation of the Debtor's Amended Plan of Reorganization, filed February 2, 1983. In support of its Motion to Dismiss the debtor's motion, filed February 11, 1983, the City of Kokomo argued that the Bankruptcy Court lacked jurisdiction to try this issue under the decision in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598, 5 C.B.C.2d 785, 9 B.C.D. 67 (1982). A hearing was held on March 1, 1983, to consider these motions.

On April 21, 1983, the Bankruptcy Court issued an Order on Withdrawal of Reference, remanding the instant action to the United States District Court, Southern District of Indiana, Indianapolis Division. On April 28, 1983, the District Court, on its own motion considered whether to refer this proceeding back to the Bankruptcy Court. The basis for this motion was the

modified Bankruptcy Emergency Rule (c)(2) which provides in pertinent part, that when reference is withdrawn from the Bankruptcy Court, the District Court "may refer the entire matter back to the bankruptcy judge with instructions specifying the powers and functions that the bankruptcy judge may exercise." The District Court granted its motion and referred this matter to the Bankruptcy Court for findings of fact, conclusions and a proposed judgment or order. The Bankruptcy Judge was subject to the limitations set out in Bankruptcy Emergency Rule (d)(1), and by (d)(3)(B) was precluded from entering a judgment or dispositive order.

On May 16, 1983, the Bankruptcy Court entered a pretrial order bifurcating the issues in this matter and postponing the presentation of evidence on damages until after a determination had been made as to liability. A bench trial on the issue of liability was conducted in the Bankruptcy Court on August 2 and 3 of 1983. At that trial, Andsu, Inc. was represented by Hans W. Steck and Richard W. Fields; the Merchants National Bank & Trust Company, Trustee, appeared by Thomas W. Dinwiddie; and the City of Kokomo was represented by Leonard Opperman and James S. Kowalik. Having duly considered the evidence introduced and the arguments advanced by the parties, the Bankruptcy Court now tenders the following findings and conclusions in memorandum form.

### Facts

Allen Dale founded The Sassi Corporation in 1974 or 1975 and became its president and major stockholder. Sometime in 1979, Dale retained Ronald Wukasch to act as consultant in developing a sludge disposal system for Sassi. Wukasch is Associate Professor of Environmental Engineering at Purdue University and is an expert on the treatment and disposal of solid waste.

Dale and Wukasch developed a process for the disposal of sludge resulting from the treatment of wastewater. This process, which came to be termed the "Sassi system", consisted of drying wet sludge and then burning it. The unique feature of the system was that the heat produced in the burning stage of the operation would be captured and used in the drying stage. Thus, the process had the advantage of being more thermally efficient.

In November of 1979, Dale approached the City of Kokomo regarding use of a Sassi system plant to dispose of the city's sludge. The sludge generated by the Kokomo Wastewater Treatment Plant contained heavy concentrations of metal, and was classified as hazardous under State Board of Health regulations on January 21, 1980. As a consequence, the City was not able to dispose of its sludge by burial in a landfill.

Dale and Wukasch met with various officials of Kokomo and explained the workings of the system. In response to a discussion with Dale, the Board of Public Works of Kokomo solicited bids for the construction of a plant utilizing the Sassi system. The Notice to Contractors, published December 21 and December 28, 1979, provided that:

> "[t]he bidder shall provide, construct and operate at his entire cost, a plant to remove the sewage sludge cake from the vacuum filters at the Wastewater Treatment Plant at 1501 West Markland Avenue, Kokomo, Indiana, and dispose of said material by means of a thermal treatment process capable of eliminating the need for disposal of sludge at a hazardous landfill. The bidder shall dispose of all material, including the ash, by proper methods acceptable to the City, County, State and Federal agencies."

The Sassi Corporation submitted a bid package in which it was stated that a Peabody burner would be part of the equipment to be used in the proposed work. The bid package also contained a standard bond, non-collusive affidavit and a bid proposal. The proposal provided at Paragraph 5 that:

> "Sassi shall dispose of all the sludge cake produced by the City's Wastewater Treatment Plant by drying it in a rotary

drum dryer and burning it in a solid fuel burner."

The bid package further contained a bound document entitled "Engineering Specifications and Schematic for Kokomo, Indiana". This document detailed descriptions of the Sassi system, including numerous references to an incinerator.

On January 21, 1980, the Board of Public Works, as contracting agency for Kokomo and The Sassi Corporation, entered into a contract for the removal of the sludge and the construction of a plant capable of disposing of the sludge. Paragraph 16 of the contract specifically states that the plant should be built in accordance with the "Engineering Specifications and Schematic for Kokomo, Indiana" which was included with the Sassi bid. The contract provided that the facility constructed by Sassi would, after ten years, become the property of Kokomo.

Under the contract Sassi was required to accept sludge, and it did so beginning on April 28, 1980. The contract further provided for completion of the facility no later than six months after the execution of the contract, which would have been July 21, 1980. Sassi was unable to complete the plant and obtained extensions by written agreements dated June 30, 1980 and October 20, 1980, and obtained an additional extension to December 31, 1982.

The Sassi Corporation collaterally assigned payments to be received under the contract to Merchants National Bank & Trust Company of Indianapolis, Trustee, pursuant to an "Assignment of Contract Revenues" dated September 1, 1980. In addition to being a party to the contract, Kokomo loaned $1,250,000.00 to The Sassi Corporation. The loan to Sassi was funded by bonds issued by the City of Kokomo and initially sold to Blunt Ellis & Lowe, Inc. To secure the loan by Kokomo, Sassi assigned an interest in revenues payable under the contract to the City of Kokomo, and to secure the payments of the bonds, Kokomo's security interest in the contract revenues was further assigned to Merchants National Bank & Trust Company.

In December of 1980, Allen Dale and The Sassi Corporation were advised by Skip Halstead, an engineer from Gordon Peabody Piatt, that Sassi needed more engineering work done on the connection of the drying system and the burning system. The Sassi Corporation decided not to do business with Gordon Peabody Piatt and contacted a company owned by Joe Zwit of Indianapolis to design an incinerator for the Kokomo sludge producing plant. Zwit suggested that Sassi design a small-scale burner or "test furnace" for the Kokomo plant to resolve any design or engineering problems before processing. Dale advised Mayor Stephen Daily of Kokomo of this development.

Mayor Daily told The Sassi Corporation and Dale not to worry about installing a full-scale burner in the plant because the City of Kokomo was considering the construction of a solid waste energy recovery facility which would have an incinerator capable of burning the dried sludge generated by the Sassi processing plant and that, in effect, the dried sludge could be co-disposed with Kokomo's solid waste to create steam or electricity. The subject of co-disposal (the burning of both solid waste and sludge in a common incinerator to create energy) had been discussed by The Sassi Corporation and Kokomo officials, including Mayor Daily, even prior to the execution of the contract. Paragraph 9 of the Sassi-Kokomo contract makes reference to the subject of co-disposal.

Within a month of Mayor Daily's statement to Allen Dale not to be concerned about installing a burner, The Sassi Corporation, in a joint venture with the Geupel DeMars Corporation, submitted a proposal to the Kokomo Board of Public Works for planning a co-disposal system for the City. The proposal was submitted at Mayor Daily's request.

In the spring of 1981, the City of Kokomo retained the firm of Camp Dresser & McKee to conduct a feasibility study for a solid waste recovery system at a cost of $37,500.00. The study, which was completed in November of 1981, found that the

co-disposal of solid waste and sludge was technically feasible.

Sassi began encountering financial difficulties in 1981 and filed a Chapter 11 petition on June 26 of that year. In January of 1982, Donald E. Foster, an Indiana businessman, was approached by Allen Dale regarding Foster's possible investment in The Sassi Corporation. Dale explained the Sassi process to Foster and Foster understood that the Sassi process involved both the drying and burning of sewage sludge. However, Foster was advised by Dale that the Kokomo plant would be complete after emissions tests had been performed and a test furnace and a conveyor system had been installed. Dale told Foster about Kokomo's plans for co-disposal, the Camp Dresser & McKee study and the Sassi-Geupel DeMars joint venture proposal. Dale further assured Foster that Mayor Daily had said there was no need to put a full-scale solid fuel burner in the Sassi facility. Allen Dale never advised Foster that under the Sassi-Kokomo contract a full-scale incinerator had to be installed in the Sassi plant. William Spencer, another Sassi representative, also told Foster that the Kokomo plant would be complete when the test furnace was installed.

Spencer gave a copy of the Sassi-Kokomo contract to Foster. This copy did not include the "Engineering Specifications and Schematic for Kokomo, Indiana" called for by Paragraph 16 of the contract. Foster had no knowledge that these plans existed until after March of 1983.

On March 26, 1982, an attorney representing Foster, Mark Gale of St. Louis, Missouri, wrote David Kleiman, the attorney representing the debtor, The Sassi Corporation, and stated in part:

"David, I still do not see any solution to my concern as to the viability of the contract with the City of Kokomo. I assume that the City, and the trustee in respect to the bond issue, have been receiving notices in respect to the Chapter 11 proceeding, and that the Kokomo contract has been affirmed, or at least not rejected. I do not understand what will prevent the City of Kokomo from taking the position that the contract has been breached on the first day, or the tenth day, etc. after the contract has been duly assigned to Andsu. As you know, the Kokomo contract originally required that the plant be operational in June of 1980. By an amendment dated June 30, 1980, this date was extended to September, by a second amendment dated October 20, 1980, the 'ready' date was extended to December 31, 1980. We are now 15 months beyond the December 30 (sic), 1980 extension date and I am at a loss as to how to assure Don Foster that the City of Kokomo will not take the position that the contract is unenforceable.

I have discussed this matter with Allen Dale on several occasions, and he has expressed concern that going to the city officials of Kokomo for ratification at this time might give them an idea that they do not now have: the ability to terminate the contract. However, I do not see any choice, and since extensions were obtained by the two previous amendments, I feel that a similar path must be followed."

Foster formed a corporation named Andsu, Inc. as a vehicle for his dealings with Sassi and Kokomo. However, Foster was advised by an attorney who had reviewed the documents provided by the City to personally meet with Kokomo officials before he invested any money. The purpose of the meeting was to insure that the parties were in agreement with allowing Andsu to be substituted for Sassi into the contract and with what Andsu understood it had to do to complete the contract.

Donald Foster met with Kokomo officials prior to the confirmation of the debtor's Amended Plan of Reorganization by the Court on May 12, 1982. He first spoke with Mayor Daily on April 16, 1982. Foster explained to the mayor that Andsu was investing $270,000.00 into a program which would complete the Sassi processing plant and allow for marketing of the technology to other municipalities. Foster told the mayor that Andsu understood the plant

would be complete after the emissions tests were performed and a conveyor system and test furnace were installed. However, Mayor Daily never advised Foster that Andsu would be required to install a full-scale incinerator.

On April 26, 1982, Donald Foster met with the Kokomo Board of Public Works. This meeting was attended by the entire Board, including its president and city attorney, Kenneth Ferries; Kokomo's city engineer, Lawrence Lambert; and the city controller, Bruce Carter. Foster explained to the Board that Andsu was investing only $270,000.00 in the Sassi project; $100,000.00 of this amount would be used to complete the facility itself, and the remainder would go towards marketing the "Sassi system". Foster specifically told the Board that the plant would be complete after three things had been accomplished: completion of emissions tests; installation of a conveyor system; and installation of a test furnace. The Board members made no mention of a full-scale burner.

The Board was given a letter by Foster at the April 26, 1982 meeting which indicated that the City had been informed of the debtor's Amended Plan of Reorganization, that the City would allow Andsu to replace Sassi under the contract and that Kokomo would give Andsu an extension of time to complete construction of the sludge processing plant. The document further stated:

> "If the plan is approved and a contingent contract becomes effective, then Andsu, Inc. will become responsible for full performance of *all* of the provisions of said contract with the City of Kokomo to the same extent that The Sassi Corporation was responsible pursuant to the provisions of that contract." (Emphasis added.)

At the time this letter was sent, Foster believed that all the contract required was a test furnace. Therefore, his assertion that Andsu would perform all provisions of the contract in no way signaled his intention to install a full-scale incinerator. It is doubtful that the Board could have mistak-

en the meaning of Foster's letter since he had announced at the meeting his plan to utilize a test burner. Moreover, it should have been clear to the Board that the money Foster proposed spending would not be sufficient to pay for a large-scale incinerator. Purchase and installation of such an incinerator would require an expenditure of $200,000.00 to $300,000.00.

The City of Kokomo, by its attorney and Board of Works president, Kenneth Ferries, received copies of the Amended Disclosure Statement and the debtor's Amended Plan of Reorganization prior to confirmation of the Plan. Ferries testified that he read these documents and that he specifically read the language on Pages 6 and 7 of the Amended Plan of Reorganization which states as follows:

> "Andsu, Inc. will also provide the necessary funds to complete the construction of the Kokomo facility, including a test furnace and *at its option* may also provide a furnace capable of burning all the sludge from Kokomo and the other municipalities." (Emphasis added.)

Ferries stated that his duties as city attorney included being familiar with the contracts to which the City was a party. Ferries was familiar with the contract between Andsu and Kokomo and he testified that he understood the contract to require Andsu to install a full-scale solid fuel burner in the plant. Nevertheless, Ferries took no steps to notify the Court of the discrepancies between the wording of the proposed Plan and Kokomo's interpretation of Andsu's obligations, nor did Ferries discuss this discrepancy with any interested or affected party. In particular, the Creditors' Committee and Merchants National Bank & Trust Company had substantial interests at stake and should have been apprised of any development which might harm those interests.

On June 28, 1982, Foster again met with the Kokomo Board of Public Works. Foster told the Kokomo Board that the sludge processing plant was running and had been processing and drying sludge since the early part of June. He also told the Board

that the test furnace was in the process of being installed and that Andsu had negotiated a tentative agreement with the Louisville Cement Company to buy the dried sludge generated by the plant. The dried sludge would be burned as fuel in their cement plant in Logansport, Indiana, thereby recapturing much of its B.T.U. value. The members of the Kokomo Board did not advise Foster at this time that the contract required the installation of the full-scale incinerator.

Sometime near the end of July or early August, 1982, the test furnace and conveyor system were installed in the Kokomo plant and Andsu obtained interim approval from the Indiana Air Pollution Control Board. On September 23, 1982, Foster notified the City of Kokomo and Ferries by letter that the plant had been completed. Along with this notice Foster enclosed a copy of a letter from himself to Merchants National Bank in which he referred to the test burner. At the time Ferries received these letters he was aware that a full-scale burner had not been installed in the facility. Nevertheless, he gave no indication that Andsu was not in compliance with the contract.

Beginning in July of 1982, Kokomo and Andsu entered into negotiations concerning the price to be paid under the contract. These negotiations were held pursuant to Paragraph 10 of that contract which provides for the readjustment of the price thirty months after the date of execution of the contract. Eight to twelve meetings took place from the first of July, 1982, until January 19, 1983, at which time the City terminated the discussions. The meetings were usually attended by Ferries and Bruce Carter and were conducted in the Kokomo City Hall.

Among the considerations affecting the price to be paid Andsu under the contract was the rise in the cost of heating fuel. If Andsu were not to install a large-scale incinerator in the plant, then heat for the drying process would have to be derived from another source. The burning of natural gas was the obvious solution. However, the high cost of this alternate fuel made the drying process more expensive, and Andsu was seeking to pass along the added expense to the City.

On October 7, 1982, Foster met with Ferries and Carter to discuss negotiations of the contract price. Foster and Carter discussed various ways that Andsu might be able to reduce the price to be paid by Kokomo under the contract. Foster told Carter that the only way to significantly reduce operating costs at the plant would be to install a full-scale solid fuel burner. He also told Carter that Andsu would be willing to discuss installing such an incinerator with the cost to be amortized over the length of the contract. Carter responded that because the City would likely be installing an incinerator in the solid waste energy recovery facility which could be used to burn the sludge as part of a co-disposal operation, there was no need for a burner to be installed in the Sassi plant.

On October 12, 1982, only five days after the meeting between Foster and the Kokomo officials, the City entered into a contract whereby it agreed to pay the construction firm of Geupel DeMars $210,000.00 to design a solid waste energy recovery facility. The design for the solid waste energy recovery facility included the installation of an O'Connor rotary incinerator. Kokomo's city engineer, Lawrence Lambert, and Dr. Wukasch both stated that the O'Connor burner was capable of burning the dried sludge from the Sassi plant.

Andsu replaced The Sassi Corporation as a party to a lease dated May 12, 1982, between Sassi and the City of Kokomo for property on which the sludge processing plant is located. By Paragraph 2 of this lease, rent in the amount of $4,000.00 per year, payable at the rate of $333.33 per month, commences upon "the 'plant completion date', as said term is defined in a certain contract between Lessor and Lessee, dated January 21, 1980 ..." At the October 7 meeting, Foster was advised by both Carter and Ferries that since Andsu had completed the plant, Andsu should

start paying rent under the lease on which the plant was located as of October 1, 1982. Andsu's statement of income and expense show that Andsu accrued $666.66, or two months' rent, under the lease.

At trial, City Controller Carter admitted he had told Andsu's attorneys that Andsu was obligated to pay rent on a real estate lease to the City. Carter now claims that the lease upon which he demanded payment was for another tract of land. The lease to which Carter refers, however, was for a one-year period beginning August 1, 1980, contained no renewal provisions and provided for rent in the amount of only $300.00 per year, payable at the rate of $25.00 per month. The discrepancies between these two leases, both as to the term and to rent, compel this Court to conclude that Carter was in fact demanding payment under the lease contingent on completion of the plant.

During the price negotiations between Andsu and Kokomo officials, the only reason given by the City for the failure to agree on price was that Kokomo's sludge could be disposed of by alternate means at a lower cost than paying Andsu to process the sludge under the contract. Ferries proposed to Andsu that it close the plant, after which the City would pay Andsu to dispose of the unprocessed sludge by hauling it to a landfill. Such dumping was again possible because Kokomo's waste had in the interim been re-classified as nonhazardous. The subject of completion of the sludge processing plant was only one of a number of contingencies discussed. Foster objected that Andsu could not break even at the price the City was offering. The cost of fuel had significantly risen, and this meant that it was much more expensive to operate the drying phase of the operation. In response to Foster's objection, Ferries stated that if Andsu was to be economically viable, it should complete the plant.

In December of 1982, Foster met with a representative of Geupel DeMars to discuss the burning of the dried sludge in the solid waste recovery facility which Geupel DeMars was designing for Kokomo. Foster advised Kokomo in writing after this meeting that Andsu believed co-disposal would reduce the operating cost of the Sassi plant by $150,000.00 per year.

On January 19, 1983, Foster met for the last time with Ferries and Carter at the Kokomo City Hall to pursue price negotiations. After the parties were unable to reach an agreement, Andsu was told by Ferries that if Andsu did not come to an agreement, then the City was going to take the position that Andsu was in breach of contract for not installing a full-scale solid fuel burner. Until that time Andsu had not been advised by Sassi or the City of Kokomo that the plant would not be deemed complete without the burner. The failure by Kokomo to apprise Andsu of the need for an incinerator was bourne out by Ferries in his testimony.

Within a few days after the price negotiations broke down, the City was still pursuing its plans for the construction of a solid waste energy recovery facility which would give it the capability of disposing of solid waste and sludge in one incinerator. Prior to January 31, 1983, the City of Kokomo filed a petition with the Indiana Public Service Commission which stated that the City was planning and designing a resource recovery plant qualifying as an alternate energy production facility as defined by I.C. 8–1–2.4–2. On February 1, 1983, the mayor of Kokomo sent a letter to State Representative William Spencer urging Spencer's support of House Bill 1912 which was then pending before the Urban Affairs Committee of the Indiana General Assembly House of Representatives. This bill had originally been introduced in the 1972 fall session of the General Assembly and the bill by its own definition of "waste" concerns the co-disposal of solid waste and sewage sludge.

Andsu invested more than $270,000.00 into the Sassi project in compliance with the terms of the reorganization Plan. It completed the installation of a test furnace and conveyor system and obtained an operating permit from the Indiana Air Pollution Control Board.

From April 28, 1980, until January 21, 1983, the City delivered sludge to Sassi and its successor, Andsu. The City made payments for the acceptance and processing of that sludge in accordance with the terms of the contract. On January 21, Kokomo refused to deliver sludge to Andsu and started hauling the sludge on its own to a land fill. The City also stopped making payments under the contract.

The contract and the Sassi sludge processing plant which are the focal points of this dispute were the principal assets purchased by Andsu as a part of the Plan of Reorganization. The revenue to be generated under the contract by the processing of Kokomo's sludge is the only income available to Andsu during the initial stages of the Plan. The cash flow under this contract was to enable Andsu to pay the various classes of creditors under the Plan and to carry out the marketing effort contemplated by the Plan.

*Conclusions of Law*

■ On January 21, 1980, the City of Kokomo and The Sassi Corporation entered into a contract for the processing of sludge generated by the City's wastewater treatment plant. Paragraph 16 of the contract provided that a facility should be constructed in accordance with the "Engineering Specifications and Schematic for Kokomo, Indiana" included with the Sassi bid. This document contained detailed plans for the erection of a "Sassi system" plant, and specifically called for the utilization of a large-scale burner. It is clear from the evidence that both Sassi and Kokomo contemplated the use of a large incinerator.

The central issues of this controversy all stem from the Bankruptcy Court's approval of the debtor's Amended Plan of Reorganization. Now, this Court is asked to determine the meaning and effect of that Plan as it relates to the rights and obligations of the parties. The City of Kokomo contends that the Amended Plan is ambiguous on its face. Article IV, A. 3, of the Plan refers to a letter of credit from Andsu to David Kleiman which guarantees Andsu's performance of obligations under the terms of the Sassi-Kokomo contract. As previously stated, the installation of a full-scale burner was an essential element of the original contract. On the other hand, Paragraph A.4 of Article IV states that Andsu may, *at its option*, install a full-scale incinerator in the plant.

The apparent discrepancy between permissive and mandatory language can only be attributed to the failure of Kokomo to apprise the Court of the requirements of the original contract. Andsu had been lead by Sassi and by various Kokomo officials to believe that the contract called for the installation of a small test furnace. The resulting Plan, then, was wholly in conformity with Andsu's expectations. The City of Kokomo, however, understood that the contract would be complete only upon the installation of a full-scale burner. Kokomo was a creditor of The Sassi Corporation within the meaning of Section 1141(a) of the Bankruptcy Code, and thus had standing to object. Yet, at no time during the course of the proceedings did the City object to the provision of the debtor's Amended Plan which allowed for Andsu to install the burner at its option.

The Bankruptcy Court is not an investigative body—it must rely on the information placed before it by the parties. In this case, Paragraph 16 of the contract between Sassi and Kokomo clearly incorporated by reference the "Engineering Specifications and Schematic for Kokomo, Indiana". These plans called for a full-scale burner. Unfortunately, this document was never placed before the Bankruptcy Court. The Court, then, acted as best it could on the facts with which it had been provided.

If a party has an objection to provisions of a proposed plan, it is the responsibility of that party to raise its objection in a timely manner. Kokomo was aware that the Plan modified the contract but said nothing. The City will not now be heard to complain of the Plan's alleged ambiguity. The Plan was not ambiguous on its face, but only from the perspective of Kokomo. For these reasons, the Court concludes that

the debtor's Amended Plan of Reorganization places the decision of whether to install a full-scale burner in the sludge treatment facility solely within the discretion of Andsu.

Section 1141(a) states in pertinent part:
"... the provisions of a confirmed plan bind the debtor ... and any creditor ... whether or not the claim ... is impaired under the plan and whether or not such creditor ... has accepted the plan."

The City of Kokomo is a creditor within the meaning of this section; therefore, it is bound by the debtor's Amended Plan of Reorganization, including the provision allowing Andsu to choose whether it will install the burner.

■ The defendant cites *In Re: LHD Realty Corp.*, Bkrtcy., 20 B.R. 717 (S.D. Ind.1982), for the proposition that a plan of reorganization cannot modify an existing contract. This is clearly not the law. In *LHD*, a debtor-in-possession and a creditors' committee filed a complaint to modify or set aside a mortgagee's lease. The Bankruptcy Court found that 11 U.S.C., § 365, which allows a trustee, with court approval, to either accept or reject an executory contract or lease, does not provide for modification of a lease after acceptance. The factual situation in *LHD* was unlike that presented here. In *LHD*, the mortgagee, Lessee, was adverse to the modification of its lease, and interposed an objection to that modification. In the present case, the City of Kokomo made no objection to the proposed Plan, but rather acquiesces to it. Accordingly, the rule in *LHD* is inapposite to the case at bar. The Court holds that Paragraph A.4 of Article IV may and did modify the requirements of the original contract.

■ Even if the City of Kokomo were not bound by the discretionary wording of the Plan, it would still be barred by the doctrine of equitable estoppel from asserting its right to a solid fuel burner. The principals underlying this doctrine are as follows:

"It has been said that the vital principle of equitable estoppel is that he who by his language and conduct leads another to do what he would not otherwise have done shall not subject such other person to loss or injury by disappointing the expectations on which he acted. The word 'conduct' is used in its broadest meaning as including spoken words, positive acts and silence where there is a duty to speak.

\*    \*    \*    \*  .  \*    \*

Thus, the doctrine of equitable estoppel shuts the door against the assertion of a right that would result in doing a wrong to some other person, or where in good conscience an honest dealing person ought not to be permitted to gainsay his previous conduct."

12 I.L.E., *Estoppel*, § 21, pp. 350–351.

■ The elements necessary to prove equitable estoppel include the five listed below:

"(1) a representation or concealment of material facts;

(2) the representation must have been made with knowledge of the facts;

(3) the party to whom it was made must have been ignorant of the matter;

(4) it must have been made with the intention that the other party should act upon it;

(5) the other party must have been induced to act upon it."

*Tippecanoe County Area Plan Commission v. Sheffield Developers, Inc.*, 394 N.E.2d 176, 185 (Ind.App.1979); *AAA Wrecking v. Barton, Curle & McLaren*, 395 N.E.2d 343, 345 (Ind.App.1979); *State ex. rel. Crooke v. Lugar*, 171 Ind.App. 60, 354 N.E.2d 755, 765 (1976).

The presence of the first element in this instance (a representation or concealment of material facts) is beyond dispute. Andsu met with Kokomo's mayor on April 16, 1982, and its Board of Public Works and Safety on April 26, 1982, and on June 28, 1982. On all three occasions, Foster advised the Kokomo officials that he understood the sludge processing plant would be complete when the emissions tests were

performed and the conveyor system and test furnace were installed. On all three occasions, Kokomo at least tacitly agreed that Foster's understanding was correct and assented to Andsu's substitution for Sassi under the contract. On September 23, 1982, Andsu advised Kokomo in writing that the plant had been completed. On October 7, 1982, Andsu was specifically told "not to worry" about installing a solid fuel burner upon Andsu's own suggestion that it might reduce plant operation costs and was specifically told to start paying rent under the lease since the plant was completed. Not once did Kokomo advise Andsu that the contract required it to install a solid fuel burner before the plant would be considered complete. Only when Kokomo realized that the changed circumstances had affected the economics of the situation did it reverse its earlier position by asserting a breach by Andsu on January 19, 1983. As stated in this Court's findings, these changed circumstances included the substantial rise in the cost of fuel needed to run the drying phase of the operation and the declassification of Kokomo's waste.

■ Andsu had a reasonable expectation that it would be informed by the City if its interpretation of the contract differed from that of Andsu's. Andsu's understanding was reflected in the Plan documents and was made clear to Kokomo through meetings with Foster. The "representation of fact" necessary for an estoppel may be accomplished by "the conduct of a party, using the word conduct in its broadest meaning as including spoken words, positive acts and a silence where there is a duty to speak." *Sheraton Corporation of America v. Kingsford Parking Co.*, 162 Ind.App. 470, 319 N.E.2d 852, 856 (Ind.App. 1974). Even absent a duty to speak, Kokomo, by its own course of conduct in allowing Andsu to proceed while knowing that Andsu did not believe it was required to install a solid fuel burner, effectively represented that Andsu is not required to install the burner.

■ Silence alone may form the basis for an equitable estoppel when a party has a duty to speak. *Martin v. Levinson*, 409 N.E.2d 1239, 1244 (Ind.App.1980); *Tippecanoe County Area Planning Commission v. Sheffield Developers, Inc.*, 394 N.E.2d at 185. As the court stated in *Seymour Improvement Co. v. Viking Sprinkler Co.*, 87 Ind.App. 179, 161 N.E. 389, 392 (1928), "common honesty" gives rise to a duty to speak in a *contractual setting* when a party knows that another is acting upon an understanding that differs with its own. Moreover, Kokomo had a duty to speak in this instance, given its own knowledge of the Disclosure Statement and Plan of Reorganization, and its responsibility to the debtor under the contract.

■ The second element of equitable estoppel (the representation must have been made with knowledge of the facts) is equally evident here. The knowledge requirement is satisfied if the party making the representation or concealing material facts has "actual or constructive knowledge of the true state of facts." *Barnd v. Borst*, 431 N.E.2d 161, 168 (Ind.App.1982). Kokomo was involved with the sludge processing project from its beginning in January of 1980. Moreover, Kokomo was directly involved in the negotiation of the contract with Sassi. Since plans and specifications exist which call for the installation of a solid fuel burner and which were incorporated by reference in the contract, it is impossible to understand how Kokomo could not have been aware of those same plans and specifications both when the contract was executed and when Kokomo agreed to allow Andsu to step into the shoes of Sassi. It is even more incomprehensible to believe that Kokomo only became aware of such plans and specifications on or about January 19, 1983 when it informed Andsu that the contract required it to install the burner.

The third element of equitable estoppel requires that the party to whom the representation was made has no knowledge of the true state of facts. Andsu's own understanding of what was required to complete the plant is reflected in the Plan documents, its written agreement with Sas-

si and in the statements made by Foster to the Kokomo officials. Andsu was aware that the plans and specifications being used to construct the plant did not call for a solid fuel burner. Andsu did not know that any other plans or the document entitled "Engineering Specifications and Schematic for Kokomo, Indiana" even existed prior to the filing of Andsu's Motion to Interpret and Reconcile on February 2, 1983. The plans and specifications were not attached to the contract itself, nor were they included in the Disclosure Statement or Appendix thereto, and were therefore not accessible by simply making reference to the contract or the Chapter 11 documents. Andsu was aware that the technological process owned by Sassi involved a solid fuel burner, but Andsu was never advised that it was required under this contract to install a full-scale burner in the Kokomo plant. In fact, the representations and omissions of Kokomo were just the opposite.

■ The fourth requisite for equitable estoppel is the intent by the party making the representation or concealment of facts that the other party act thereon. The intent that a party act on the representation or concealment is "inferred from the acts of the parties" even though the inference when made is "contrary to the actual intent." *Northern Indiana Supply Co. v. Chrisman,* 139 Ind.App. 27, 204 N.E.2d 668, 674 (1965). The requisite intent does *not* require an intent to defraud as the court in *Barnd v. Borst, supra,* explained:

"It is well settled that there need not be any design to defraud in order to constitute an estoppel. It is sufficient that the conduct of the party has been knowingly such as would make it unconcionable on his part to deny what his conduct had induced another to believe and act upon in good faith and without knowledge of the facts."

431 N.E.2d at 168.

Kokomo's intent that Andsu act on Kokomo's representation and concealment of facts is established by its own conduct in allowing Andsu to be substituted for Sassi under the contract. Regardless of its actu-

al intent, Kokomo's conduct in allowing Andsu to go forward with the project and the contract while knowing that Andsu believed it could complete the plant without installing a burner is sufficient to create an inference that Kokomo intended for Andsu to act on the facts as Andsu understood them and as Kokomo represented them to be.

The fifth element of equitable estoppel (the other party must have been induced to act) is established by Andsu's investment of over $270,000.00 into the sewage sludge disposal project in satisfaction of its obligations under the Plan and the contract. Andsu's frequent meetings with Kokomo, prior to the confirmation of the Plan and during the completion of the plant, were held to ensure that Kokomo wanted to keep the contract in force and continue with the sludge disposal project. Andsu agreed to assume Sassi's obligations under the contract based upon Kokomo's conduct, the statements of Kokomo officials and Kokomo's silence with respect to what was required to complete the plant. Andsu's reliance is unquestionable given the relationship of the contract to the Plan and given that the contract is the only regular source of income for Andsu during the initial stages of operation of the Plan.

The doctrine of equitable estoppel applies in this instance even though one party to the contract, namely Kokomo, is a municipal government. Indiana courts have long held that the state and its agencies are subject to the same rules of contract law and equity as are private citizens. *State v. Wright,* 97 Ind.App. 660, 665, 175 N.E. 666, 667 (1931). Furthermore, "[r]esolute good faith should characterize the conduct of states in their dealings with individuals, and there is no reason, in morals or law, that will exempt them from the doctrine of estoppel." *State of Indiana v. Milk,* 11 F. 389, 397 (Cir.Ct.D.Ind.1882).

Kokomo cannot be heard to complain in this instance that it lacked the statutory authority to enter into the contract or that it cannot be bound by the statements and conduct of its officials who dealt with And-

su. Under I.C. 36–9–6–3, Kokomo's Board of Public Works and Safety has statutory authority to contract for the "erection of all buildings and other structures needed for any public purpose." In addition, I.C. 36–9–6–19 authorizes the Board of Public Works to contract for the removal of all refuse from the city. Kokomo, by its language and conduct, has lead Andsu to assume the obligations of Sassi under the contract and to expend money in performance of those obligations with knowledge that Andsu's actions were taken upon belief that it could complete the sludge processing plant without installing a solid fuel burner. Kokomo cannot now in good conscience be permitted to assert an alleged contractual right that flies in the face of its previous conduct, statements and silence.

■ Not only is it estopped from asserting a breach of the contract by Andsu, the City of Kokomo is also barred by the common law doctrines of waiver and laches. Waiver has been defined by the Indiana Supreme Court as follows:

"Waiver is the intentional relinquishment of a known right; an election by one to forego some advantage he might have insisted upon." *Doan v. Fort Wayne*, 253 Ind. 131, 252 N.E.2d 415 (1969).

A condition in a contract, including a condition precedent, may be waived by the conduct of a party to the contract. *Northern Indiana Steel Supply Co. v. Chrisman*, 204 N.E.2d at 675; *Johnson v. Bucklen*, 9 Ind.App. 154, 36 N.E. 176 (1894).

The distinction between waiver and estoppel was explained by the court in *City of Evansville v. Follis*, 161 Ind.App. 396, 315 N.E.2d 724, 728 (1974):

"There is a distinction between waiver and estoppel. A person who is in a position to assert a right or to insist upon an advantage may by his own words or conduct, and without reference to any act or conduct of the other party affected thereby, waive such right; and once such right is waived, it is gone forever, and he will therefore be precluded from asserting it." (Emphasis added.)

Thus, the issue of whether Kokomo has waived its right to insist upon a solid fuel burner must be determined without reference to any acts, statements, knowledge or conduct of Andsu.

■ Kokomo's conduct in the course of price negotiations with Andsu clearly evidences a voluntary and intentional relinquishment of its right to insist upon the installation of a solid fuel burner. Throughout these discussions, Kokomo never once demanded the addition of an incinerator. On the contrary, it was actively involved in attempting to hammer out with Andsu a price settlement under the contract. It is obvious that at this point Kokomo was treating the contract as completed. Only when Kokomo concluded it could not reach an agreement on price with Andsu did it adopt the position that completion of the contract required the burner's installation.

That Kokomo deemed the contract complete is also evident from its demands to Andsu for payment under a lease on the property where the sludge processing plant is located. These payments were not to commence until completion of the facility; yet, at an October 7, 1982 meeting, Foster was advised by both Carter and Ferries that Andsu was obligated to make rental payments on the plant as of October 1, 1982. Carter also admitted at trial that he had told Foster's attorneys that Andsu owed rent on a real estate lease with the City. Although he now claims that the lease upon which he demanded payment was for another tract of land, this Court must conclude that Carter's comment referred to the contingent lease. Rent on that lease was set in the amount of $4,000.00 per year, payable at a rate of $333.33 per month. The lease to which Carter claims he referred was for only $300.00 per year, payable at the rate of $25.00 per month; furthermore, this lease was for a one-year period beginning August 1, 1980, and contained no renewal provision. Reason dictates that it could not be the lease for which Carter demanded payment.

One of the principal arguments advanced by the City of Kokomo is that it would

have never knowingly waived its right to insist on a full-scale burner because such a waiver could in no way benefit the City. This argument fails to take note of one major consideration: at the time that Kokomo began its negotiations with Andsu, Sassi had run out of money and was incapable of completing the plant. Thus, the City was faced with an economic dilemma. It could demand a full-scale incinerator, in which case the City ran the risk that Andsu might not take over the Sassi project, or it could waive its right to the burner in hopes of encouraging Andsu's participation. From Kokomo's point of view, it would clearly be better to have Andsu assume the obligations of Sassi and build a plant with a test burner than for the City to get nothing. This is especially true since Kokomo no longer felt the need for a large burner as it was contemplating co-disposal.

The equitable doctrine of laches also applies with equal force to the facts in this dispute. The court in *State ex. rel. Crooke v. Lugar*, 354 N.E.2d at 765, described the three elements of laches as follows:

(1) inexcusable delay in asserting a right;

(2) implied waiver arising from knowing acquiescence in existing conditions; and

(3) circumstances causing prejudice to the adverse party.

Kokomo has inexcusably delayed its assertion of right under the contract to the prejudice of Andsu. Kokomo had numerous opportunities in its discussions with Andsu to inform Andsu that the contract required installation of a solid fuel burner. Kokomo was aware through its knowledge of the Plan documents and its meetings with Foster that Andsu believed it need only install a test furnace to complete the plant and that it had the option to install the solid fuel burner. Kokomo's acquiescence in allowing Andsu to proceed with the project while possessing this knowledge is tantamount to an implied waiver of any right to insist on the installation of a solid fuel burner. Andsu's expenditures and performance of its obligations under the Plan and under the contract constitute sufficient prejudice so as to invalidate Kokomo's claim of justified breach.

Finally, the defendant argues that Andsu should be denied the equitable benefits of waiver and estoppel because it comes into this action with unclean hands. In support of this position, the defendant points to the March 26, 1982 letter from Foster's attorney, Mark Gale, to David Kleiman. Kokomo would have the Court believe that this correspondence reveals Andsu's awareness of the need for a full-scale burner. If this indeed were the case, then the letter could be read as a warning by Gale to Kleiman not to alert the City to its legal remedies for Andsu's breach.

Kokomo's interpretation of the letter is mistaken. Gale's warning does not refer to the inclusion or exclusion of a solid fuel burner, but merely to Sassi's failure to complete the sludge processing facility on time. Sassi and Andsu received several time extensions during the course of the project, and negotiations for these extensions were conducted with the City in a fair and open manner. Kokomo was informed of the reasons for the delays in completion and agreed to these delays with full knowledge of the facts. Andsu and Foster dealt with the City in an equitable manner and are before this Court with clean hands.

*Conclusion*

Based upon the evidence introduced at trial and the legal authorities cited herein, the Court finds that Andsu has performed all of its obligations under the contract and the Plan of Reorganization, that Kokomo has without justification breached the contract with Andsu and that Andsu has been damaged by Kokomo's breach. The original contract between Sassi and the City of Kokomo required the installation of a solid fuel burner for the Kokomo plant; however, the contract was modified when the Bankruptcy Court confirmed the debtor's Amended Plan of Reorganization. The Amended Plan contained the proviso that Andsu could install a full-scale furnace at its option. Under 11 U.S.C. § 1141(a), all creditors, including the City of Kokomo, are bound by the terms of that Plan. Ac-

cordingly, the decision whether or not to install a large burner in its sludge disposal facility is solely with the discretion of Andsu.

Even if Kokomo were not bound by the discretionary language of the debtor's Amended Plan, it would still be barred by the doctrine of equitable estoppel from asserting the absence of that burner as an excuse for its own nonperformance. This estoppel rests on three findings:

(1) Kokomo failed to inform the Court and Andsu that Kokomo's understanding of the contract requirements differed from the obligations of Andsu under the Plan;

(2) Kokomo agreed to allow Andsu to be substituted for Sassi under the contract after Andsu had described in detail its own understanding of what needed to be done to complete the plant; and

(3) when Andsu suggested that installation of a solid fuel burner might reduce costs, Kokomo informed Andsu that it did not need to worry about such installation.

In addition, Kokomo has waived its right to insist upon the installation of the incinerator and is also barred by the doctrine of laches from asserting this right.